HALEY *v.* STATE.

[85 South. 129, In Banc. No. 21142.]

1. HOMICIDE. *Evidence as to provocation and its effect held to justify charge on manslaughter.*

On the trial of a husband indicted for the murder of his wife's paramour, if the evidence for the defendant tended to prove that the accused was so aroused by the wife's confession of adultery that he neither ate nor slept, was in constant state of excitement and agitation for two days, when under great feelings he shot the deceased "to protect his vows," it was not error to authorize the jury by proper instruction to convict of manslaughter.

2. HOMICIDE. *Whether particular provocation has spent its force is a question for the jury.*

Whether a particular provocation has spent its force and there has been time for cooling is a question of fact for the proper determination of the jury.

3. CRIMINAL LAW. *Separation of a jury in a capital case because of illness held no ground for a new trial.*

The defendant, indicted and convicted of murder, moved the court for a new trial because of the separation of the jury. It appeared that one of the jurors became suddenly ill, after evidence in chief for the state was in; that the juror was permitted to go up a winding stairway to the jury dormitory. When dinner time came the sick juror remained in the dormitory in charge of a bailiff, while the other jurors, accompanied by bailiffs, went to a hotel and ate. This was repeated at supper and at breakfast the next morning. The sick juror was attended by a physician

three times, but in presence of a bailiff. No outside or third party had any communication with the juror, except his physician. *Held*, that the action of the court in overruling the motion was correct.

4. CRIMINAL LAW. *Separation of jury because of illness, without communication with third party, would not affect verdict.*

Not every separation of a juror from his fellows constitutes an unlawful separation. An emergency separation by a juror because of sudden illness, and under circumstances which indicate no communication by outsiders except that of a physician, is not such a separation as will affect the verdict.

APPEAL from circuit court of Yaobusha County.

HON. E. D. DINKINS, Judge.

O. K. Haley, was convicted of manslaughter, and he appeals. Affirmed.

*O. K. Haley, H. H. Creemore and W. F. Hamilton,* for appellant.

The separation of the jury, was in violation of the rights of the defendant and it is immaterial whether improper influence was exerted upon the jury or not. The testimony fails to exclude opportunity for communication with the juror, either through the physician who attended him or through some person not disclosed by the testimony who was in the ante-room or stairway when the juror unceremoniously left the jury box.

As in the case cited below the state made no effort to show any facts by any witnesses which would relieve the conduct of the juror of that suspicion which naturally attaches to it; and this at least the state was bound to do before the verdict should have been permitted to stand. It is not necessary that an attempt should be made to bias the minds of the jurors or that any pernicious influence should be exerted. The door to tampering is to be closed. This is the only security. If it be left open, it may be predicted with certainty that the evil conse-

quences will fall somewhere. *Hare* v. *State,* 4 Howard, 187. It may be argued by the attorney general, as it has been argued in other cases, that if there was error in permitting the jury to separate, such error was cured and the defendant waived the benefit thereof by not making a motion to discharge the jury after the separation had occurred the second time and after the court stated that if such motion was made, it would be sustained.

To answer this view, we need only to quote from chief Justice Peyton: "We are of the opinion that the court has no power to authorize the separation of the jury during the trial of a capital case, either with or without the consent of the prisoner, except in cases of great necessity; and if it be done, and the prisoner be found guilty a new trial will be granted. The prisoner should not be asked to consent. Who dare refuse to consent when the accomodation of those in whose hands are the issues of his life or death is involved in the question? He would have to calculate the chances of irritation, from being annoyed by a refusal on the one hand, and of tampering on the other. No consent of the prisoner, in the extremity of his need, ought to bind him. He may not really be willing to permit the jury to separate, but may consent for fear that his refusal may prejudice the jury against him. *Woods* v. *State,* 43 Miss. 364.

2. The state's instruction defining and authorizing a verdict of manslaughter. "It is the general rule that insanity, when interposed as a defense in a criminal prosecution is either a complete defense or none at all, and it has been held that there is no degree of insanity sufficient to acquit of murder but not of manslaughter. 14 R. C. L. 599.

"There can be no recognition of the doctrine that a man is incapable of distinguishing between right and wrong so as to determine that the case is not a case of murder, and yet capable of distinguishing between right

and wrong so as to be guilty of manslaughter. There is no such doctrine and nothing in the books that favors any such idea.'' *United States* v. *Lee,* 54. A. R. 294. (Supreme Court District of Columbia).

''From the very nature of the mental disease, there can be no grade of it by degree so as to accord with a degree in crime. To say that a man is insane to an extent which incapacitates him from fully forming an intent to take life, yet enables him to fully and maliciously form an intent to do great bodily harm without a purpose to take life is absurd, for the one involves the same test of responsibility as the other, ability to distinguish between right and wrong. Either the offense of defendant is wholly excused be cause the jury is satisfied by the preponderance of evidence of his irresponsibility or he is guilty, because the evidence fails to so satisfy them. *Commonwealth* v. *Wircback,* 70 A. S. R. 625 (Penn.)

We have discussed the question of insanity and its application to degrees of homicide and have quoted from the foregoing authorities to show (which perhaps is unnecessary) that the instruction on manslaughter cannot be justified on any theory growing out of the defense of insanity.

We understand of course that there are cases where one could take part of the state's testimony and believe that, and part of the defendant's testimony and believe that, and disbelieve part of the state's testimony and part of the defendant's testimony, and thus weave out from various fragments of the testimony from both sides a case of manslaughter. But this is not such case; there is no warp nor woof nor even a single thread for a manslaughter garment in this case.

Without citing many cases announcing this doctrine we content ourselves with the following: *Virgil* v. *State,* 33 Miss. 320; *Johnson* v. *State,* 78 Miss. 627, 29 So. 515; *Hannah* v. *State,* 87 Miss. 375, 39 So. 855; *Parker* v. *State,* 102 Miss. 113, 58 So. 879; *Rester* v. *State,* 110 Miss. 689, 70 So. 881.

It is well established that to reduce a homicide from murder to manslaughter it must appear not only that the killing was done in the heat of passion, but also that the provocation was sufficient to negative the inference of malice. *Smith* v. *State,* 58 Miss. 867.

Since the testimony showed that the defendant was neither guilty of murder or was not guilty of anything and as he has been acquitted of murder by the verdict of the jury and the finding of a verdict of manslaughter was not authorized by the testimony, and it was fatal error to submit the question of manslaughter to the jury, we respectfully submit that the judgment appealed from should be reversed and a judgment should be entered here finally discharging the appellant.

*W. M. Hemingway,* Assistant Attorney-General, for the state.

One of the jurors, named Scurr, was taken sick, and separated from the other jurors on several occasions, being attended by a physician three times, in the presence of a bailiff. This is urged as ground for a reversal. The controlling case in this state on that condition is *Skate* v. *State,* 64 Miss. 644. All of the preceding cases are noted and distinguished, among them being the case of *Woods* v. *State,* 45 Miss. 364, where the jury was permitted to disperse, and its members mingled with the public. And in the Skates case it is said of them all: "In all these cases the verdicts were set aside and new trials awarded." It will be noted in all of them it is neither shown that other persons had been brought in contact with the jury, or that there was a separation of the jury, under such circumstances as to accord a reasonable presumption that communication was had with others; there was in each case something more than a remote possibility that such communication was had, though in many of the cases, observations were made by the court indicating that any

separation of one juror from his fellows would be suf-
ficient to annul the verdict unless it was affirmatively
shown that no communication was had with others. We
find no fault with the results reached in either of the
cases cited, but we do not concur in the language used in
some of them, from which the conclusion is sought to be
drawn, and reasonably, that the mere withdrawal of a
juror from the sight of his fellows and of the officers is
under any and all circumstances a separation of the
jury.

Whether it is, or not, might as it seems to us, be depen-
dent upon the circumstances of each particular case.
. . . If the mere possibility of unlawful communica-
tion or influence is sufficient to annul a verdict, when shall
one be said to be pure and free from suspicion. All our
courthouses are public places, and the public have the
right of access to them. At sessions of court many per-
sons are there congregated either from curiosity or by
reason of business for themselves or others. Jury rooms
open into the courtroom, frequently filled with specta-
tors; communication by writing, by signs and by words is
always possible, but it would be destructive to the ends
of justice to hold that such possibility as this of unlaw-
ful influence should avoid verdicts upon which no just
suspicion rests.''

This opinion contends that the act of the juror must be
sufficient to create a well-founded suspicion in the im-
partial judicial minds that unlawful influences have been
exerted. The only opportunity this juror had to communi-
cate with anyone was with the physician who attended
him and the bailiff was present, and no improper com-
munication was had. The Skates case is determinative of
this case.

Our statute law contains no requirements as to the
conduct of the juror. Section 2717, Code of 1906, section
2210, Hemingway's Code. So we must fall back upon
the common law and reason as to when a juror has dis-

qualified himself so as not to be able to render a fair and
impartial verdict. In *Green* v. *State,* 59 Miss. 501, the
court says: "It is not every act of misconduct on the part
of jurors which will entitle defendant to a new trial, but
where such acts are shown, if they are of such character
as may have prejudiced the defendant, the presumption
is that they did, and it devolves upon the state to estab-
lish that such results did not follow But where all the facts
and circumstances are known, and it appears with reason-
able certainty that though there was exposure to in-
fluences which might have perverted or corrupted the
judgment of the juror, it was not done, then the verdict
ought to stand. If, however, it is clearly shown that,
in fact, the juror was not communicated with, the pre-
sumption no longer exists, and the verdict will be up-
held.

The communication alluded to must be an attempt to
influence him in the case on trial. In the instant case
there was no undue influence or communication shown,
and all the facts and circumstances are known, as in the
Green case.

In the *Cartwright case,* 71 Miss. p. 82, the jury had
newspapers to read; one of the jurors went into a store
alone called for paper and pen, and wrote a note. This is
referred to by the court as "an unwarranted and wholly
unexplained separation of the jurors," and it raised the
suspicion of undue influence, and the state should have
explained his conduct. No explanation was necessary
in the instant case, because no circumstance of suspicion
attached. The separation belongs to the clause of sep-
aration known as 'emergency separation." In mere
'emergency separation' of one or more of the jurymen,
where there is nothing at all to show misconduct during
the separation, there is not ground for a new trial. 24
L. R. A. (N. S.), note p. 784.

There are temporary separations in the dining room
where they must converse with the waiters in ordering
their meals. This is permissible; and by the same rule

a sick juror, conferring in the presence of a bailiff with his physician, would not be guilty of such a separation or misconduct as to cause a reversal.

"The temporary separation of one juror because of illness is not a ground for a new trial." *State* v. *Schmidt,* 137 Mo. 256, 38 S. W. 898; See. also, *Davis* v. *State,* 54 Tex. Crim. Rep. 236, 114 S. W. 366; 16 R. C. L., sec. 119, p. 311, notes 15 and 16; *Gamble* v. *State,* 60 L. R. A. p. 547.

Now, as to the illness of the juror, the court states: "The bailiffs and sheriff affirm that the eleven had no communication with anyone, and that the juror Scurr remained in the dormitory alone during the period of the separation, and that the juror was under the care of L. M. Walker, bailiff. The juror, while sick and uncomfortable, said at all times he thought he would be better and able to go through with the trial and was apparently feeling very well."

"The illness must be of such a case as incapacitates the juror from performing his duties in a proper manner." 16. C. J. 1094, and Note 21.

With the foregoing view of this case, the fact that appellant's counsel, in their very desperate straits, did not make the motion to discharge the jury, when the court told him he would sustain such a motion, does not weigh very heavily, because, their rights having been invaded, if they had been invaded, they would have lost their day by not objecting. They did have their day in the motion for a new trial which motion was overruled.

## INSTRUCTION ON MANSLAUGHTER

Appellant complains of the instruction given for the state defining manslaughter. It is instruction No. 8, p. 131, and reads as follows: "The court instructs the jury that if you believe from the evidence in the case, beyond a reasonable doubt that the defendant shot and

killed the deceased at a time when he knew the act was wrong, in the heat of passion, without malice and authority of law, and not in necessary self-defense, then he is guilty of manslaughter and the jury should so find and the form of their verdict should be: 'We the jury, find the defendant guilty of manslaughter.'"

If the giving of this instruction is error, appellant cannot complain, for instruction No. |7, page 133, given at his request, would permit the conviction for manslaughter, for it reads: "The court instructs the jury that if they believe from the evidence that at the time of the shooting the mind of the defendant from any cause was in such a condition as to be incapable of forming a premeditated design or deliberating coolly, then the defendant is not guilty of murder."

This instruction authorizes the jury to find any verdict they felt the evidence justified, except murder, and would seem to present fairly the condition of mind of appellant, as shown by the evidence. And under these instructions and all the evidence, the jury was justified in reaching the verdict they did.

The killing occurred on Wednesday; the disclosures of appellant's wife were made on Monday immediately preceding. Appellant was in such a condition that he did not sleep or eat—very much worried. On Tuesday night she told the appellant of the statements made by deceased as to his daughter, who had recently died of the "flu."

If this were a case where appellant had been humiliated by defeat in a personal combat, or by abusive language, the cooling time would certainly have been sufficient. But his state of mind was evidently such as is contemplated in the giving of the seventh instruction for the defendant. When he contemplated the manner in which the hospitality of his home had been abused, the wrecking of his home, the reflection upon his dead daughter, one disclosure coming after the other, he certainly could not have deliberated coolly within the time, ⹁

His conduct was that of a man humiliated beyond control, and acting with deadly intent, regardless of consequences, and failure to call the attention of the jury to his condition, and to permit consideration of manslaughter, would have been a mistake on both sides.

It is unquestioned that the jury is authorized to pass upon the sanity of defendant. 1 McLain on Criminal Law, section 165; R. C. L., section 69 p. 607.

The jury decided that appellant could not avail himself of the defense of insanity, as he was not insane. Although tried beyond control, he knew what he was doing, stated the reasons for the killing, secured a lawyer, with the advice of a friend, and stated that the deceased knew why he killed him. There was no expert testimony as to his sanity, nor claim that he was insane at the time of trial. He knew his friends, and insisted on talking about his trouble. He told his friends and others that he would not try to escape. His sanity was submitted under proper instructions and rejected as a defense by the jury. It is the rule that insanity is either a defense, or not a defense; but having rejected the defense of insanity the jury was left to deal with the facts of the case, and to find such verdict as they thought would be justified. This case is a clear illustration of a condition of facts that would permit the jury to disregard the question of insanity, and to act upon the evidence produced by both sides. It is not correct that the evidence produced showed the defendant guilty of murder, or not of anything, under the circumstances, which were calculated to make the appellant lose control of himself. The question of manslaughter should have been submitted to the jury for what it was worth. If the instruction for the state was in compromise, and unfair to the defendant, so was instruction No. 7 for the defendant. In *Parker case,* 102 Miss. 13, *Hannah v. State,* 87 Miss. 375, the court refused to instruct on manslaughter. That was not error, for the homicide was either deliberate murder, or committed in self-defense.

And so it is with all the other cases reducing itself to the rule that instructions must be based on the evidence.

As sustaining the position of the state in this case, we refer to *Moore* v. *State,* 86 Miss. 160. Of course, if appellant was insane, he was incapable of committing a crime; but as the evidence did not justify such, the conclusion is that the authorities cited on this are not in point. The rule in other cases is too well established.

As to the suggestion that the appellant be dismissed here, this cannot be done, because the instructions given by both sides were correctly given.

In the case of *Parker* v. *State,* 102 Miss. 113, the court said: "This state seems to have adopted the rule that a conviction for the lesser crime involved in this charge preferred in the indictment worked an acquittal of the defendant for the greater crime. The soundness of this rule may be seriously questioned, and in many jurisdictions the rule of acquittal by implication has been abandoned."

The court has not acted upon that rule in subsequent cases, in each case the cause has been reversed and remanded. For a full discussion of this point see *State* v. *Gillis,* 5 L. R. A. (N. S.) 57. The result of such a rule would be that a person guilty of a crime would be turned loose upon circumstances of the trial, and not upon the circumstances in the case. While here the law must be vindicated, and the verdict of manslaughter was correct

STEVENS, J., delivered the opinion of the court.

Appellant was indicted for the murder of one Lewis Melvin, tried and convicted of manslaughter, and sentenced to ten years in the penitentiary. The homicide occurred in the waiting room of the Illinois Central Railroad Depot in Water Valley. The deceased had purchased a ticket as a passenger, and was waiting the arrival of the passenger train scheduled to pass near 3 o'clock

p. m. The prominent facts in reference to the actual difficulty are as follows:

Appellant was seen to approach the depot from the east with a gun in his hand, walking directly to the main entrance to the waiting room, then filled with men, women and children, and immediately began to fire at the deceased, Melvin, with a high-powered rifle. Melvin at first was seated, but when the first shot was fired arose and ran across the room, and with a great outcry attempted to get behind a stove, but the defendant fired a second shot, and was working the magazine of his gun in preparation for a third shot when a bystander seized him, pulled appellant and his gun away from the door, and in the scuffle the rifle discharged the third time. There was no word spoken up to this time, and no demonstration or overt act on the part of the deceased. A second bystander came to assistance of the first, and appellant thereupon surrendered, and stated that there need be no fear of his attempting to escape. Appellant was thereupon delivered to the jailor and incarcerated, and attempted to talk with several persons about the trouble, and to give a history of his troubles with Melvin. It developed that Melvin had been shot through the right arm near the shoulder, and on advice of a physician, who was immediately called for first-aid treatment, was sent that night to the Charity Hospital at Jackson, Miss., for a shoulder amputation. The operation proved fatal, and Melvin died as a result of appellant's assault.

On the trial there was no attempt to deny or contradict the material facts for the state; the sole defense being the alleged insanity of the defendant.

To support the plea of insanity certain nonexpert witnesses who had known the defendant for several years gave testimony as to his highly nervous condition, appearance, and manner both at the time of the homicide and for a day or two preceding, and at least one of the witnesses stated in his opinion the defendant was insane at the time

of the shooting. This testimony tends to show that from Monday, the day of certain disclosures hereinafter referred to, until Wednsday afternoon at 2:10 o'clock, the time of the shooting, the defendant had neither eaten nor slept; that he had conversed with two or three of his friends about his troubles with Melvin, and had declared that he must kill Melvin in order to protect his vows. The substance of the domestic troubles which provoked the tragedy may be briefly detailed as follows: Appellant contracted his second marriags in 1912 at Banner, an interior village in Calhoun county some eighteen miles from Water Valley, and resided in Banner some two years, when he moved first to the Mississippi Delta, from there to Boise City, Idaho, and thence to Butte, Mont., where he worked in the mines and operated a sawmill for the mines. While at the latter place he employed the deceased, who at that time was known as Lewis Miller. It was not long before appellant decided to return to Banner to engage in farming. To this end appellant sent his wife and child to Banner and with them as a cropper or helper the deceased, Lewis Miller, appellant remaining in Montana. When they arrived and established themselves on the farm the household consisted of appellant's wife and child, Lewis Miller, appellant's adult son by his first wife, and an unmarried sister of Mrs. Haley. Miller and appellant's son did the farming until the 11th day of April, when Mr. Haley arrived. On the last day of the same month, April 30th, the homicide occurred.

Mrs. Haley testified that on Monday night preceding the killing a certain attitude of her husband provoked from her a confession that Melvin, while a roomer in the house, had tempted and overpersuaded and practically by combined force and persuasion led her to break her marriage vows, and thereupon admitted to her husband that she and Melvin had been guilty of adultery. It is in testimony that appellant thereupon confronted Melvin with the charges preferred by his wife, and had a near

difficulty, in which the young man, appellant's son, intervened. It resulted in Melvin leaving the premises, but according to Mrs. Haley he reappeared the next day at the back door of the kitchen, and attempted to have further conversation with her. Melvin demanded a settlement of his wages before leaving, but appellant declined to pay anything.

The deceased went into Water Valley on Tuesday, and on Wednesday morning sold his watch for ten dollars, and was leaving the country when the shooting occurred. In some way not fully disclosed by the record appellant knew or suspected that the deceased intended to catch the north-bound Illinois Central train Wednesday afternoon, as early Wednesday morning appellant left Banner, armed with a high-powered rifle, and rapidly walked down the roadway in mud and through driving rain, and immediately proceeded to the depot in search of the deceased. The trouble was aggravated by Mrs. Haley on Tuesday night making further alleged disclosures, telling her husband that the deceased since arriving at Banner had boasted of having illicit relations with appellant's adult daughter by his first wife, who had recently died of influenza, and her statement is that this additional disclosure further enraged her husband so much so that he was weeping, wailing, tearing his hair, lying down, then immediately gettingup, praying, refusing to take nourishment, or sleep. To this is added the testimony of the postmaster at Banner and others that appellant was mad, according to some, and according to others that he was so depressed with trouble that he declared his intention to kill Melvin, and it is clear from all of the testimony, including the condition of appellant immediately after the shooting, that he was in a very abnormal condition in the sense that his passions were exceedingly aroused. At the same time the wife testified that he was a perfectly sane man under normal conditions, and all of the testimony shows clearly that

there was no hereditary insanity; that appellant had never been suspected of being crazy; that he attended to his own business affairs; was the employer of the deceased; and before his domestic troubles was perfectly sane.

The court by an instruction submitted to the jury the issue of manslaughter, and there was a verdict of manslaughter. At the same time the defendant obtained the following instruction, among others:

"The court instructs the jury that if they believe from the evidence that at the time of the shooting the mind of the defendant from any cause was in such a condition as to be incapable of forming a premeditated design or deliberating coolly, then the defendant is not guilty of murder. (Given.)"

It is contended on this appeal that appellant is either guilty of deliberate murder or nothing, and that it was error to submit the issue of manslaughter.

Another assignment is based upon the alleged separation of the jury. It appears that the juror Scurr became suddenly ill, and by necessity left the jury box, proceeded up a winding stairway to the jury dormitory, at that time unoccupied, and there remained in charge of a bailiff, and was attended by a physician. By agreement a statement of the trial judge of the facts upon which this alleged error was predicated was incorporated in the record in the nature of a bill of exceptions. The statement is as follows:

"After the jury was impaneled, and accepted by both sides and the evidence in chief offered on behalf of the state had been heard, and the state had announced that it would rest, W. B. Scurr, one of the jurors, was taken sick; and when dinner time came, or was announced, he was permitted to remain in the dormitory of the courthouse, prepared for the jury, with one of the bailiffs of the jury, while the other eleven, accompanied by the bailiffs, went into the city, a distance of about one hund-

red and fifty yards from the courthouse, to the hotel to which they were accustomed to repair for meals, under the custody of the bailiff, and had their dinner; Mr. Scurr being absent. It is because of this separation a motion was presented by the defendant to discharge the jury and enter a mistrial, which motion, upon an agreed statement of facts to the effect as above, was overruled. Again at supper hour a like separation occurred, which was repeated at the breakfast hour the next day or next morning; the sick juror remaining in the dormitory with the bailiffs, and the other eleven repairing under the care of bailiffs to the same hotel. After breakfast, when the trial was about to be resumed, the juror's condition being improved, counsel for the defendant stated to the court that the motion previously made would be renewed and a new motion would be presented to the same effect as the first, setting out the two separations last above mentioned. Whereupon the court stated if the motion was presented it will be sustained, and counsel, asking for time, reported later the motion would not be presented, but that he would reserve the right to take such course as he saw fit at the end of the trial. The juror was effected either with a serious case of indigestion or cholera morbus, and was attended three times by a physician, but always in the presence of the bailiffs. On the afternoon of the day when the juror was first taken sick, and after a short recess had been taken on account thereof, and an attempt been made to resume the trial, the juror left the box and proceeded across the courtroom, through an anteroom and toilet room, and up winding stairs to the jury dormitory. . . . The winding stairs used communicated with the jury dormitory above and the lavatory, or washstand, below, which immediately opens into the sheriff's office on the lower floor. The juror was unattended, but the anteroom passed and the dormitory was unoccupied. Within a short time the other members of the jury repaired to the dormitory, and re-

mained with the juror Scurr until the trial was finally
resumed, excepting such separations as the above state-
ment shows occurred at that time. The juror was rend-
ered very uncomfortable, and was apparently suffering
considerably from the effects of his illness, but said at
all times he thought he would soon be better and able to
go through with the trial. The trial was resumed and
concluded with his consent and upon his assurance that
he was physically able to endure it, and that he was men-
tally capacitated for the service, and it was and is the
judgment of the trial court that the juror did not suffer
from any mental incapacity, and at the end of the trial
he was apparently feeling very well.''

It is conceded that the law of the case was abundant-
ly given in charge to the jury, including instructions
pertaining to the alleged insanity, the only complaint on
instructions being as above noted.

The record in our judgment affirmatively shows that
the defendant received a fair and impartial trial, and
there is no reversible error. It was not error under the
peculiar facts of the case to grant an instruction on
manslaughter. Our statute (section 1238, Code of 1906;
section 968, Hemingway's Code) provides:

''The killing of another in the heat of passion, without
malice, by the use of a dangerous weapon, without au-
thority of law, and not in necessary self-defense, shall
be manslaughter.''

Of course, counsel's contention on this point is based
upon the assumption that appellant did not act in the
heat of passion, but coolly and deliberately planned and
killed the deceased. The question as to whether the
killing by a husband of his wife's paramour, caught in
the act of adultery, be manslaughter as a matter of law
and the question as to whether under the circumstances
of this record the jury are warranted by the facts in
finding manslaughter are different and distinct ques-
tions. In *Reed* v. *State*, 62 Miss. 405, reaffirmed in *Row-*

*land* v. *State,* 83 Miss. 483, 35 So. 826, 1 Ann. Cas. 135, it is expressly held that if the husband, finding the offender in the act of adultery with his wife, slays him on the spot, in legal contemplation and as a matter of law it was manslaughter, and the court would not, under such circumstances, uphold a verdict of murder. But this court has never held, so far as our observation goes, that disclosures such as appellant's wife made in the present case would not so arouse the husband's feelings and passions as to bring him within our statute expressly defining manslaughter. It is well stated by Mr. Wharton:

"Whether there has been cooling time is eminently a question of fact, varying with the particular case and with the condition of the party. There are some provocations which, with persons of even temperament, lose their power in a few moments; while there are others which rankle in the breast for days and even weeks, producing temporary insanity. Men's temperaments also vary greatly as to the duration of hot blood; and it must be remembered that we must determine the question of malice in each case not by the standard of an ideal 'reasonable man, but by that of the party to whom the malice is imputed.' Wharton's Criminal Law (10th Ed.), Vol. 1, par. 480.

The question in all cases similar to the case at bar is one of fact for the jury The mere fact that the killing was intentional is not the test. In Wharton on Homicide (3d Ed.), par. 195, it is stated:

"To reduce a killing from murder to manslaughter, all the circumstances of the case must lead to the conclusion that the act done, though intentional, was not the result of cool, deliberate judgment, and previous malignity of heart, but solely imputable to human infirmity."

But it is frequently a question of fact for the jury whether malice existed, and peculiarly a fact for the jury where there is evidence either for the state or the

defendant warranting the jury in finding that the act was done in the heat of passion. There is no fixed period of time for cooling. Whether there has been time for cooling and malice engendered depends upon the circumstances, and sometimes upon the temperament of the defendant on trial. All of the testimony for the defendant in the present case tends to show that the defendant was in a constant state of agitation from Monday night until Wednesday afternoon, and acted under great excitement at the time he fired the shot, He refused to eat or sleep, he wept, bemoaned his fate, prayed, and conferred with his neighbors about what he considered a necessity to avenge an outrage upon his home. As said by Judge LUMPKIN in *Biggs* v. *State*, 29 Ga. 723, 76 Am. Dec. 630, speaking of the jury's province in a case of this kind:

"What is the annihilation of houses or chattels by fire and faggot compared with the destruction of female innocence; robbing woman of that priceless jewel which leaves her a blasted ruin, with the mournful motto inscribed upon its frontals, 'Thy glory is departed'? Our sacked habitations may be rebuilt, but who shall repair this moral desolation? How many has it sent suddenly, with unbearable sorrow, to their graves?"

And in that case the court charged the jury for the state "that, whatever may have occurred on the night previous to the difficulty at the breakfast table, it could not amount to a justification or excuse for the act of shooting the morning after the difficulty." And in condemning this instruction the court said:

"And this instruction was based, no doubt, upon the idea that sufficient time had elapsed for passion to subside and for reason to resume her sway. In many cases, this doctrine is true; but we cannot think it a sound proposition, under the facts and circumstances which surrounded these parties. The husband had heard and seen

the personal indignity offered his wife the night before. He permitted Parish to escape, with threats of punishment should he remain in the city. The very next morning, at the breakfast table, he unblushingly resumes his seat in the immediate neighborhood of his intended victim. Was it human to keep cool in such a situation? To see the man who had attempted to desecrate the family altar the night before seat himself within two chairs of his wife! And was it not right and proper, in order to account for his violence, to give in proof to the jury the occurrences of the preceding evening? To shut out the scene which transpired in the bedchamber is to deprive the jury of the power of appreciating the transport of passion kindled in the bosom of Biggs by the presence of Parish. With our view of the law, we feel constrained to award a new trial in this case."

In *Hooks* v. *State,* 99 Ala. 166, 13 So. 767, the husband thought he observed his wife and another in a compromising position, and in discussing the question of provocation the court said:

"Where one person detects another in the act of adultery with his wife, and he immediately slays the adulterer or his wife, as a matter of law the provocation is sufficient to reduce the killing to manslaughter. The law does not declare that anything less than actual sexual intercourse is a sufficient provocation, as a matter of law, to reduce the offense from murder to manslaughter. It may be that the detection of another under circumstances such as testified to by the defendant may provoke and engender passion to such a degree as to overthrow reason; and if, under the influence of passion thus aroused, he immediately attack the offending party, and slay him, before cooling time has intervened, not from malice or unlawfully formed design, but from such passion, thus provoked, the offense may be manslaughter. Whether the party acted under the influence of such a

passion, and whether the provocation was sufficient, and whether there had been 'cooling time,' are questions of fact to be determined by the jury. The principle we announce is that the law does not declare the provocation sufficient unless the parties are detected in the act; but a jury may say whether the compromising position of the parties was sufficient to arouse passion in the husband to such a degree as to overthrow reason, just as a jury may say, in some other cases, whether the offense was the result of sudden and sufficient provocation to reduce the offense from murder to manslaughter."

Whether there has been space for cooling is largely governed by the evidence in the particular case. The time may be so far removed as to justify the court in excluding the evidence of adultery as a matter of law. It is true that the evidence in the present case was introduced largely upon the alleged issue of insanity, but its necessary effect was to establish the existence of passion, or at least to warrant the jury in finding that the unlawful act was done in the heat of passion. As appellant has himself introduced this testimony, how can he complain that the jury declined to believe he was insane, but have seen fit to inflict modified punishment? Mr. Wharton declares:

"There may therefore be phases of mind which cannot be positively spoken of as either sane or insane. Are persons in one of these phases to be acquitted of crime? If so, they would constitute a class not only dangerous, but uncontrollable; for they would not be sane enough to be convicted as felons, and yet would not be insane enough to be confined as lunatics. Are they to be convicted, when charged with offenses involving malice and premeditation? At this justice would revolt, for at the time of the commission of the guilty act the defendant, as it could readily be shown, was not in a condition of mind coolly to premeditate, or accurately to contemplate, a malicious design. Under such circumstances the better

course is to find the defendant guilty of the offense in a diminished grade, when the law establishes such grade; or, when it does not, to inflict on him modified punishment. Nor is this view inconsistent with the analogies of the law. Such considerations (i. e., those of the defendant's mental constitution) are invoked whether we have to determine whether a party assailed acted bona fide when resorting to violent measures of self-defense. So do we gauge responsibility in cases of sleep drunkenness; so do we estimate the conduct of persons when roused by any great political or religious excitement.'' Wharton's Criminal Law, par. 47, p. 62.

Counsel for appellant boldly assert that their client is either a cold-blooded murderer or a crazy man. The evidence does not justify such conclusion. We are not to be understood as holding that the jury might not have returned a verdict of murder. This is far from holding that there is no warrant for the verdict of manslaughter. If the jury had believed beyond a reasonable doubt that appellant left his home that Wednesday morning with a rifle in hand and murder in his heart they could well have returned a verdict of murder. But if they in fact concluded that the defendant fired the shot amidst tears and lamentations—under feelings of great passion—as some of the witnesses indicated, then in the language of Mr. Wharton ''justice would revolt'' at a verdict of murder.

As to the separation of the jury, it affirmatively appears that the juror Scurr in the course of the trial was suddenly taken ill, but constantly remained in the hands of the bailiff, and there was no communication between him and outside or third parties, except the physician who ministered to him in the presence of the bailiff.

In *Skates* v. *State,* 64 Miss. 664, 1 So. 843, 60 Am. Rep. 70, this court expressly stated: ''We do not concur in the language used in some of them (previous decisions of this court) from which the conclusion is sought to be

drawn, and reasonably, that the mere withdrawal of a juror from the sight of his fellows and of the officer is under any and all circumstances a separation of the jury. . . . If the mere possibility of unlawful communication or influence is sufficient to annul a verdict, when shall one be said to be pure and free from suspicion? All our courthouses are public places, and the public have the right to access to them. At sessions of court many persons are there congregated, either from curiosity or by reason of business for themselves or others. Jury rooms open into the courtroom, frequently filled with spectators, or by windows overlook the yard; communication by writing, by signs, and by words is always possible; but it would be destructive to the ends of justice to hold that such possibility as this of unlawful influence should avoid verdicts upon which no just suspicion rests. To this all must agree.''

The true test there indicated is whether the judicial mind would conclude that unlawful influence has been exerted. If the declarations of our court in the Skates Case must control, the test has been met, and the judgment here challenged should be affirmed on this point. Our statutory law lays down no requirements for the conduct of jurors, but, on the contrary, under section 2717, Code of 1906 (section 2210, Hemingway's Code), it is provided ''after grand and petit juries are impaneled they shall be under the control of the courts,'' etc.

In *Green* v. *State,* 59 Miss. 501, this court said: ''Where all the facts and circumstances are known, and it appears with reasonable certainty that though there was exposure to influences which might have perverted or corrupted the judgment of the juror, it was not done, then the verdict ought to stand.''

The books abound with cases where there has been temporary or emergency separation of one or more of the jurymen, and the question has been frequently pre-

sented as to whether such emergency separation is ground for a new trial. By necessity there are many innocent communications with jurors. In the dining room jurors are attended by waiters, and communicate with them in the course of a meal. It has been expressly ruled that temporary separation produced by sudden illness is not necessarily a ground for a new trial.

"The temporary separation of one juror because of illness is not a ground for a new trial." *State* v. *Schmidt,* 137 Mo. 266, 38 S. W. 938.

We cannot believe that the mere communication with a physician about the juror's illness and needed medicine in any wise operates to the prejudice of the accused.

In *Gamble* v. *State,* 44 Fla. 429, 33 So. 471, 60 L. R. A. 547, 103 Am. St. Rep. 150, 1 Ann. Cas. 285, an instance is recited where one of the jurors, being sick, was accompanied by the bailiff and another juror out of the hotel, into town, where they saw a doctor, and from the doctor went by a drug store and back to their room at the hotel.

In the note to *Armstrong* v. *State,* 2 Okl. Crim. 567, 103 Pac. 658, 24 L. R. A. (N. S.) 776, many instances are given of temporary separations, some of which are in point and support an affirmance of the case at bar.

The rule as stated by Corpus Juris is as follows: "Not every withdrawal of a juror from the immediate presence of his fellows constitutes such a separation as will affect the verdict. The rule that the jury must be kept together does not apply even in capital cases to temporary separation of one or more jurors from the others in cases of necessity, where the separating jurors are in charge or in sight of an officer, and are not allowed to communicate with other persons. So, also, a temporary separation by a juror under circumstances which indicate that no communication by outsiders was had with him in regard to the case, or that he was not in any way

influenced in regard thereto, is not such a separation as will affect the verdict." 16 C. J. 1077, section 2350.

We conclude, therefore, upon both points argued, there is no material error, and the judgment of the learned circuit court is accordingly affirmed.

*Affirmed.*