IRVING, J.,
 

 for the Court:
 

 ¶ 1. This appeal is from Danny Jerard Jackson’s conviction, in the Harrison County Circuit Court, for murder and the resulting sentence of life in the custody of the Mississippi Department of Corrections. Feeling aggrieved by his conviction, Jackson appeals and asserts that the circuit court entered improper jury instructions, erroneously allowed the State to impeach one of Jackson’s witnesses with a prior conviction, and erred in denying Jackson’s motions for a new trial and directed verdict.
 

 ¶2. We find no reversible error and, therefore, affirm the circuit court’s judgment.
 

 FACTS
 

 ¶ 8. On June 27, 2007, Jackson stabbed his wife’s lover, Neco Strickland, to death outside a convenience store in Harrison County, Mississippi. Jackson became aware of his wife’s infidelity over the course of several weeks or months.
 

 ¶4. On the night of Strickland’s death, Jackson was at home when he realized that his wife, Angela, had left. Jackson had previously learned what type of car Strickland drove and that he lived at the River Ten Apartments near Orange Grove, Mississippi. When Jackson realized that Angela was gone, he went to the River Ten Apartments looking for her. Once there, he found Angela’s ear parked next to the car that he believed belonged to his wife’s lover. Jackson began banging on apartment doors, looking for Angela. A security guard at the complex, Jack Powell, told Jackson to stop knocking on the doors. When Jackson informed Powell that he was looking for his wife, Powell told Jackson to go home. Powell testified that Jackson seemed calm and that he would have “called for some units if [Jackson] was mad or upset or something.” Powell maintained that Jackson was looking for Angela, not for her lover.
 

 ¶ 5. Jackson testified that he went to a nearby convenience store to buy beer and alcohol. As he was leaving, he saw Strickland. He claimed that he recognized Strickland from illicit pictures that Angela had taken of herself with Strickland. According to Jackson, Strickland was speaking on a cellular telephone, and as Jackson neared him, Jackson thought that he heard Angela’s voice on the other end of the telephone. Jackson then went to his vehicle and retrieved a knife. In Jackson’s statement that he gave to law enforcement shortly after the stabbing, he stated that he did not encounter Strickland in the store, but saw Strickland standing at a gas pump as he was leaving the gas station’s parking lot.
 

 ¶ 6. In any event, Jackson confronted Strickland after he retrieved his knife. Things escalated quickly, and Jackson stabbed Strickland multiple times in front of several witnesses. At trial, Jackson claimed that Strickland punched him before he pulled the knife out; Jackson never made that allegation to any of the officers who questioned him after the stabbing. One of the witnesses to the stabbing, Mike Koplitz, testified that Jackson pulled the knife out from under his clothing and began stabbing Strickland “with extreme force” and “without much being said.” Strickland stumbled away from Jackson, across the road to a Subway parking lot, where he collapsed face down. Jackson got in his vehicle, drove across the road to where Strickland lay, and then exited the vehicle and
 
 *712
 
 stabbed at Strickland’s back multiple times. Michael Hale, who witnessed the stabbing in the Subway parking lot, testified that he attempted to render aid to Strickland, but Strickland was non-responsive and gasping for air. Strickland died shortly thereafter from his wounds.
 

 ¶7. At trial, Jackson claimed that he “couldn’t control” himself when he attacked Strickland: “Well, I went out to the pump and, you know, asked him what his name was. It blew up from there, you know. I couldn’t control myself. My mind wasn’t there. I wasn’t myself.” Jackson claimed that he blacked out and could not remember anything that happened from the time of his initial confrontation with Strickland until sometime after he had finished stabbing Strickland. Shortly after the stabbing, Jackson was able to describe to Detective Ron Kirkland of the Gulfport Police Department what occurred; it was only at trial that Jackson claimed that he had blacked out after the stabbing.
 

 ¶8. After stabbing Strickland to death, Jackson reentered his vehicle and left the Subway parking lot. However, one of the witnesses was able to take down Jackson’s license-plate number, and Jackson was later taken into custody and questioned by Detective Kirkland. Detective Kirkland first made contact with Jackson outside Jackson’s apartment. At that time, Jackson told Detective Kirkland that he did not want to get his mother-in-law “involved”; Detective Kirkland testified that he then told Jackson that “no one was going to get in trouble unless they had anything to do with the crime.” According to the detective, Jackson then stated that “no one else had anything to do with it.” The knife that Jackson used to stab Strickland was recovered from the middle of a driveway outside a car dealership on June 28, 2007. Bloody clothes were recovered from a washing machine in Jackson’s apartment. Samples were also taken from blood stains inside Jackson’s vehicle. DNA testing of the blood on the knife, Jackson’s car, and Jackson’s clothes revealed that the blood came from Strickland. On December 17, 2007, Jackson was indicted for Strickland’s murder.
 

 ¶ 9. Multiple eyewitnesses to the stabbing testified at Jackson’s trial, as did law enforcement and a DNA expert. At the close of the State’s case, Jackson moved for a directed verdict and requested that the case continue on the lesser-included offense of manslaughter. The circuit court denied the motion, finding that the State had “proven at least a prima facie case of deliberate[-]design murder....”
 

 ¶ 10. Angela took the stand in Jackson’s defense and testified regarding her affair with Strickland. Jackson also took the stand and testified that he did not intend to encounter Strickland at the gas station. Several character witnesses testified on Jackson’s behalf. During deliberation on jury instructions, Jackson objected to the State’s proposed instruction as to deliberate design. The circuit court overruled Jackson’s objection and allowed the instruction; the court also refused Jackson’s proposed instruction as to deliberate design. Thereafter, the jury found Jackson guilty of deliberate-design murder. The circuit court sentenced Jackson to a mandatory term of life imprisonment. It is from that judgment that Jackson appeals.
 

 ¶ 11. Additional facts, as necessary, will be related during our analysis and discussion of the issues.
 

 ANALYSIS AND DISCUSSION OF THE ISSUES
 

 1. Jury Instructions
 

 ¶ 12. When reviewing jury instructions, we read the instructions “as a
 
 *713
 
 whole to determine whether the jury was fully and fairly instructed according to the applicable law.”
 
 Clark v. State,
 
 40 So.3d 531, 544 (¶ 36) (Miss.2010) (citing
 
 Davis v. State,
 
 18 So.3d 842, 847 (¶ 14) (Miss.2009)). “In other words, if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law, no error results.”
 
 Id.
 
 (quoting
 
 Davis,
 
 18 So.3d at 847 (¶ 14)). Although Jackson had the right to present his theory of the case, that “right is not absolute.”
 
 Id.
 
 (citing
 
 Davis,
 
 18 So.3d at 847 (¶ 14)). Specifically, the circuit court “may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.”
 
 Id.
 
 (quoting
 
 Spires v. State,
 
 10 So.3d 477, 483 (¶ 28) (Miss.2009)).
 

 ¶ 13. Jackson presents two complaints regarding the circuit court’s jury instructions. The first is that the circuit court improperly denied his proposed instruction on the cooling-off period and deliberate-design murder. The second is that the State’s instruction, which was granted, improperly defined a time limit for deliberate-design murder. In the interest of completeness, we will quote extensively from the jury instructions in this case.
 

 ¶ 14. Jackson’s proposed instruction on the cooling-off period, D-10, reads as follows:
 

 It is the decision of the Jury whether the Defendant, DANNY JERARD JACKSON, acted in a “heat of passion[,]” and if the Defendant received information that made him act in a “heat of passion[,]” and not with deliberate design, it is a jury question whether there has been enough time for the Defendant to cool off from his initial state of mind that would be raised to a “heat of passionf.”] Whether there has been cooling time is eminently a question of fact, varying with the particular case and with the condition of the party. There are some provocations which, with persons of even temperament, lose their power in a few moments; while there are others which rankle in the breast for days and even weeks. Men’s temperaments also very [sic] greatly as to the duration of hot blood; and it must be remembered that we must determine the questions of deliberate design in each case, not by the standard of an ideal “reasonable man[,”] but by that of the party to whom the deliberate design is imputed.
 

 However, this was not the only instruction that touched on “heat of passion” and deliberate design. Instruction S-l, which was given by the circuit court, states in part:
 

 The Court instructs the Jury that the Defendant, DANNY JERARD JACKSON, has been charged in the Indictment with the crime of Murder for having caused the death of Ñeco F. Strickland, with the deliberate design to effect the death of Ñeco F. Strickland. If you find from the evidence in this case beyond a reasonable doubt that:
 

 1. on or about June 27, 2007, in the First Judicial District of Harrison County, Mississippi,
 

 2. the Defendant, DANNY JERARD JACKSON, did wilfully, feloniously and without the authority of law, kill and murder Ñeco F. Strickland, a human being,
 

 3. with deliberate design to effect the death of Ñeco F. Strickland,
 

 then you shall find the Defendant ... guilty of Murder.
 

 Instruction S-3, which was also given, states in its entirety:
 

 The Court instructs the jury that deliberate design to kill is all that is required
 
 *714
 
 by Mississippi law to make a homicide a murder. Deliberate design means intent to kill, without authority of law and not being legally justifiable, legally excusable[,] or under circumstances that would reduce the act to a lesser crime.
 

 Instruction S-5, which was given by the circuit court, defines heat of passion and states:
 

 The Court instructs the jury that the term heat of passion is defined as a state of violent and uncontrollable rage caused by certain provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment^] or terror.
 

 The passion felt by the person committing the act should be induced by some insult, provocation, or injury, which would naturally and instantly produce, in the minds of ordinarily constituted men, the highest degree of exasperation. In other words, passion and anger alone are not sufficient to reduce a crime from murder to manslaughter.
 

 The State also provided an instruction explaining the circumstances under which the jury should have found Jackson guilty of manslaughter rather than murder. That instruction, S-8, was given by the circuit court and reads as follows:
 

 If you find that the State has failed to prove all of the essential elements of the crime of Murder, you may consider the lesser charge of Manslaughter. However, it is your duty to accept the law given to you by the Court, and if the facts and the law warrant a conviction of the crime of Murder, then it is your duty to make such finding uninfluenced by your power to find a lesser offense. This provision is not designed to relieve you from the performance of an unpleasant duty. It is included to prevent a failure of justice if the evidence fails to prove the original charge but does justify a verdict for the lesser crime. Therefore, if you find the Defendant ... not guilty of Murder, then you shall proceed with your deliberations to decide whether the State has proved beyond a reasonable doubt all of the elements of the lesser crime of Manslaughter.
 

 If you find from the evidence beyond a reasonable doubt that:
 

 1. on or about June 27, 2007, in the First Judicial District of Harrison County, Mississippi;
 

 2. the Defendant ... did willfully, unlawfully[,] and feloniously kill and slay Ñeco F. Strickland, a human being,
 

 3. without malice, in the heat of passion by the use of a dangerous weapon, to-wit: a knife,
 

 4. without authority of law and not in necessary self-defense,
 

 then you shall find the Defendant ... Guilty of Manslaughter.
 

 If the State has failed to prove any one or more of these elements beyond a reasonable doubt, then you shall find the Defendant ... Not Guilty of Manslaughter.
 

 Finally, the State offered an instruction, S-9, defining “deliberate design”; Jackson argues that the circuit court erred in giving this instruction. It reads as follows:
 

 The Court instructs the jury that “deliberate design” as it is used in these instructions, means an intent to kill without authority of law, and not being legally justifiable, or legally excusable. “Deliberate” always indicates full
 
 *715
 
 awareness of what one is doing, and generally implies careful and unhurried consideration of the consequences. “Design” means to calculate, plant,] or contemplate. “Deliberate design” to kill a person may be formed very quickly and perhaps only moments before the act of killing the person. However, a “deliberate design” can not [sic] be formed at the very moment of the fatal act.
 

 For clarity’s sake, we will address separately each of Jackson’s complaints regarding these instructions.
 

 a. Instruction S-9
 

 ¶ 15. Jackson argues that the circuit court erred when it gave Instruction S-9, which defines “deliberate design.” Jackson contends that the instruction is duplicative of other instructions and that it improperly placed a time limit on deliberate design. Jackson argues that the State’s instructions “were more likely to confuse the jury because they bifurcated discussions of ‘deliberate design’ and ‘heat of passion,’ leaving the jury able to assume that both might exist in the mind of the defendant at the time.”
 

 ¶ 16. Instruction S-9 can be found nearly verbatim in several Mississippi Supreme Court eases. In
 
 Jones v. State,
 
 39 So.3d 860, 865-66 (¶ 32) (Miss.2010) (quoting
 
 Gossett v. State,
 
 660 So.2d 1285, 1293 (Miss.1995)), our supreme court stated the following regarding its treatment of deliberate design:
 

 Th[is] Court has defined deliberate design, stating that “ ‘deliberate’ always indicates full awareness of what one is doing, and generally implies careful and unhurried consideration of the consequences. ‘Design’ means to calculate, plan, contemplate ... deliberate design to kill a person may be formed very quickly, and perhaps only moments before the act of consummating the intent.”
 

 A comparison of this quotation with Instruction S-9 shows that the two are nearly identical. As for the part of the instruction that stated that deliberate design cannot be formed “at the very moment of the fatal act,” that statement of law has also been widely accepted by Mississippi appellate courts.
 
 See, e.g., Carter v. State,
 
 722 So.2d 1258, 1263 (¶ 18) (Miss.1998);
 
 McCain v. State,
 
 971 So.2d 608, 613 (¶ 13) (Miss.Ct.App.2007). Therefore, Instruction S-9 was an accurate statement of the law in Mississippi.
 

 ¶ 17. Instruction S-9 was not duplica-tive of other instructions. Instruction S-3 touches on deliberate design, and reads that deliberate design is: “intent to kill, without authority of law and not being legally justifiable, legally excusablet,] or under circumstances that would reduce the act to a lesser crime.” However, this is certainly not duplicative of the language in Instruction S-9, which defined both “deliberate” and “design” in the context of deliberate-design murder and also properly instructed the jury as to when the deliberate design to commit murder may be formed.
 

 ¶ 18. The instructions as given were proper and correct; there is no indication that they confused the jury or were likely to do so. This part of Jackson’s contention is without merit.
 

 b. Proposed, Instruction D-10
 

 ¶ 19. Jackson contends that his proposed instruction D-10 is “an accurate statement of the law,” that the instruction would have informed the jury that “‘the duration of hot blood’ is a
 
 subjective
 
 consideration,” and that the proposed instruction was not duplicative of other instructions.
 

 ¶ 20. There was a colloquy at trial regarding whether to issue Instruction D-10:
 

 
 *716
 
 [THE COURT]: D[-]10, [S]tate?
 

 [PROSECUTOR]: Your Honor, we would object to this because it’s in conflict with the deliberate[-]design instruction, and in a sense that it is a jury question of whether there is enough time for the defendant to cool off from his initial state of mind and would raise to a heat of passion. I believe that the appropriate instruction is covered in S[-]9, and this bottom paragraph is simply a statement of fact which we feel is inappropriate' for an instruction.
 

 [THE COURT]: I have already given a heat[-]of[-]passion instruction, and I really have problems with the last two sentences of this instruction as just stating some abstract statement about reasonable persons. It will be refused.
 

 [DEFENSE ATTORNEY]: Judge, before you go any further, judge, this comes verbatim from
 
 Hailey versus State
 
 [sic], [123 Miss. 87] 85 So. [129], 1920 case. It’s been around Mississippi since then. It’s been cited and it’s cited in ALR as an example of the law that’s been followed in many jurisdictions.
 

 If I can approach the bench[,] I will show you where I verbatim took this instruction out of Hailey [sic].
 

 [THE COURT]: All right. Let me see it. This is a quotation from Mr. Wharton, Wharton’s Criminal Law. All right. That is not an instruction that has been approved by the Supreme Court, so I’m going to deny it.
 

 [DEFENSE ATTORNEY]: All right. Judge, we take exception, but we don’t feel this particular issue is covered in any of the other instructions. Hailey [sic] points out among other things that a heat of passion can arise for days, weeks, and, of course, the State’s instruction on deliberate design pretty much guts that. And the law is clear, Hailey [sic] has been cited in other cases and followed. It’s an old case that has been around for a long time. In fact, it’s cited in ALR.
 

 [THE COURT]: Has the Mississippi Supreme Court cited any instructions referring to Hailey [sic]?
 

 [DEFENSE ATTORNEY]: No, but I couldn’t — I ran out of time in shepard-izing it. And I do have the ALR.
 

 [PROSECUTOR]: Your Honor, I would just on the basis [sic] that it is cumulative, covered by the heat[-]of[-]passion and the deliberate[-]design instructions as well.
 

 [THE COURT]: All right. You’ve got your exception in the record, [defense attorney].
 

 ¶ 21. The case that the defense attorney cited to the circuit court is
 
 Haley v. State,
 
 123 Miss. 87, 85 So. 129 (1920). It is true that Instruction D-10 is quoted nearly verbatim from the following passage in
 
 Haley,
 
 123 Miss. at 104, 85 So. at 131:
 

 Whether there has been cooling time is eminently a question of fact, varying with the particular case and with the condition of the party. There are some provocations which, with persons of even temperament, lose their power in a few moments; while there are others which rankle in the breast for days and even weeks, producing temporary insanity. Men’s temperaments also vary greatly as to the duration of hot blood; and it must be remembered that we must determine the questions of malice in each case, not by the standard of an ideal ‘reasonable man,’ but by that of the party to whom the malice is imputed.
 

 This case is more than ninety years old; although never overruled, we have also not found any subsequent appellate case that
 
 *717
 
 has cited this particular language favorably. Furthermore, the above passage is not the Mississippi Supreme Court’s own words; rather, the
 
 Haley
 
 court was quoting a passage from Wharton’s Criminal Law.
 

 ¶ 22. The information that this instruction was attempting to convey had already been given in other instructions; therefore, we agree that the instruction is dupli-cative. Deliberate design and the time period during which it may arise had already been adequately explained' by Instructions S-9 and S-3. Although none of the given instructions explicitly informed the jury to determine deliberate design from Jackson’s point of view, the instructions implicitly told the jury that it would have to consider Jackson’s state of mind. For example, Instruction S-9 states: “‘Deliberate’ always indicates full awareness of what one is doing, and generally implies careful and unhurried consideration of the consequences. ‘Design’ means to calculate, plant,] or contemplate.” Furthermore, the jury was never told to consider deliberate design from an objective standpoint.
 

 ¶ 23. Considering all of the above, we find no merit to this contention.
 

 2. Impeachment
 

 ¶24. Jackson contends that the State was improperly allowed to impeach Terry King, one of Jackson’s character witnesses, with evidence of a prior conviction. During King’s cross-examination, the following exchange occurred:
 

 [PROSECUTOR]: Have you ever been convicted of a felony?
 

 [KING]: Yes, sir.
 

 [PROSECUTOR]: Okay.
 

 Nothing further, your Honor.
 

 [DEFENSE ATTORNEY]: Just objection, unless they tell us what crime it was.
 

 [COURT]: Well he can if he wants to give the nature of the crime, but can’t [sic] go into the specifics of it.
 

 [DEFENSE ATTORNEY]: Correct.
 

 [PROSECUTOR]: I just asked if he was a convicted felon.
 

 [COURT]: Right.
 

 [DEFENSE ATTORNEY]: Judge, that is a fishing question. If he didn’t even know what he’s been convicted of, it may be one that is not admissible under [Rule] 609, and he just flat out asked a question during [c]ross[-ex-amination] where he had no reasonable basis to ask the question, which you can’t do.
 

 [PROSECUTOR]: Your Honor, if I may respond, I will follow-up on my question.
 

 [COURT]: All right.
 

 [PROSECUTOR]: Mr. King, were you convicted of controlled substance— possession of a controlled substance [on] July 22nd, 2002?
 

 [KING]: Yeah. That was—
 

 [DEFENSE ATTORNEY]: We object, judge, because he knows that is not one that is impeachable under [Rule] 609. Should have never brought it up. That is improper cross-examination of this witness. And, judge, I’m going to request a mistrial.
 

 [PROSECUTOR]: Your Honor, if I may respond, this is not a party witness. It is a non-party witness of which any prior felony conviction is admissible under [Rule] 609.
 

 [COURT]: All right. The objection will be overruled.
 

 ¶ 25. Rule 609 of the Mississippi Rules of Evidence governs the impeachment of
 
 *718
 
 witnesses by evidence of a prior conviction. The rule states, in pertinent part, that:
 

 (a) General Rule. For the purpose of attacking the character for truthfulness of a witness,
 

 (1) evidence that (A) a nonparty witness has been convicted of a crime shall be admitted subject to Rule 408, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted....
 

 * * *
 

 (b) Time Limit. Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction ... substantially outweighs its prejudicial effect.
 

 Rule 403 of the Mississippi Rules of Evidence states that relevant evidence may be excluded “if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.”
 

 ¶ 26. The comment to Rule 609 attempts to explain why non-party witnesses are treated differently from party witnesses under the rule:
 

 Rule 609(a)(1) was amended in 2002 to incorporate the rationale of decisions by the Mississippi Supreme Court which recognized the difference in the highly prejudicial effect of showing the convictions when the witness is the accused and the little prejudicial effect from such impeachment of other witnesses. It was reasoned that when the impeachment by convictions is of a witness other than the accused in a criminal case[,] there is little or no unfair prejudice which can be caused to a party. Thus, the probative value on the credibility of the witness will almost always outweigh any prejudice.
 

 ¶ 27. We review the circuit court’s decision to allow the impeachment evidence under an abuse-of-discretion standard.
 
 Strickland v. State,
 
 980 So.2d 908, 919 (¶ 18) (Miss.2008).
 

 ¶ 28. The circuit court in this case did not perform a Rule 408 balancing test, although it should have before allowing the evidence.
 
 Young v. State,
 
 731 So.2d 1145, 1151 (¶ 39) (Miss.1999);
 
 Peterson v. State,
 
 518 So.2d 632, 636 (Miss.1987). Nevertheless, we find no reversible error. In
 
 Young,
 
 the Mississippi Supreme Court stated the following about the impeachment of a non-party witness in a criminal trial: “What the trial judge failed to consider is because [the witness] is not a party in this case, any prejudice to him is irrelevant.”
 
 Young,
 
 731 So.2d at 1151 (¶ 39). This statement led to the 2002 revision of Rule 609.
 

 ¶ 29. In this case, the details of King’s prior conviction were introduced at trial only because Jackson’s counsel objected and requested that the State give the details of the crime. Furthermore, had the circuit court conducted a Rule 403 balancing test, there is no doubt that it would have found that the probative value of the conviction outweighed its prejudicial effect. As the
 
 Young
 
 court stated, any prejudice to King was irrelevant. Jackson argues that the introduction of the evidence was prejudicial to him because it indicated that he socialized with a convicted felon. By this standard, any prior conviction of a defense witness who personally knew the defendant would be too prejudicial to allow. Such is clearly not the case.
 
 *719
 
 There was nothing about King’s crime that was related to Jackson’s murder charge. Furthermore, Jackson’s good character was testified to by several other witnesses. Therefore, even if King’s credibility was improperly challenged, the evidence that he offered was cumulative.
 

 ¶ 30. Under these circumstances, any error in admitting the evidence was, at worst, harmless. This contention of error is without merit.
 

 3. Sufficiency and Weight of the Evidence
 

 ¶31. In his final contention of error, Jackson challenges the weight and sufficiency of the evidence against him. We address these two issues separately below.
 

 a. Sufficiency of the Evidence
 

 ¶ 32. The Mississippi Supreme Court has a well-established standard of review for claims regarding the sufficiency of the evidence supporting a conviction:
 

 A motion for directed verdict challenges the sufficiency of the evidence, and “the critical inquiry is whether the evidence shows ‘beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed[.]’ ”
 
 [Jones v. State,
 
 904 So.2d 149, 153 (¶ 12) (Miss.2005)]. In judging the sufficiency of the evidence, “the trial judge is required to accept as true all evidence that is favorable to the State, including reasonable inferences that may be drawn therefrom, and to disregard evidence favorable to the defendant.”
 
 [Clemons v. State,
 
 460 So.2d 835, 839 (Miss.1984) ].
 

 Thomas v. State,
 
 42 So.3d 528, 537-38 (¶ 31) (Miss.2010).
 

 ¶ 33. In order to prove that Jackson committed murder, the evidence must show that Jackson (1) killed Strickland (2) without authority of law but with (3) the “deliberate design to effect his death.”
 
 Brown v. State,
 
 965 So.2d 1023, 1030 (¶ 27) (Miss.2007) (citing
 
 Dilworth v. State,
 
 909 So.2d 731, 736 (¶ 18) (Miss.2005)). There is no factual question with regard to the first two. It is clear that Strickland died as a result of the wounds that Jackson inflicted upon him, and there has been no allegation that Jackson had any authority to kill Strickland. As to deliberate design, the
 
 Brown
 
 court stated the following:
 

 “Deliberate design to kill a person may be formed very quickly, and perhaps only moments before the act of consummating the intent.”
 
 Gossett v. State,
 
 660 So.2d 1285, 1293 (Miss.1995) (quoting
 
 Windham v. State,
 
 520 So.2d 123, 127 (Miss.1987)). This Court has acknowledged that deliberate-design connotes an intent to kill and may be inferred through the intentional use of any instrument which, based on its manner of use, is calculated to produce death or serious bodily injury.
 
 Wilson v. State,
 
 936 So.2d 357, 364 (Miss.2006) (internal citations omitted). In
 
 Wilson,
 
 this Court found sufficient evidence to convict the defendant of deliberate-design murder where the victim had been beaten and repeatedly stabbed by the defendant. This Court also has recognized that shooting a victim with a gun constituted deliberate-design murder.
 
 See Jones v. State,
 
 710 So.2d 870 (Miss.1998);
 
 Hawthorne v. State,
 
 835 So.2d 14 (Miss.2003).
 

 Brown,
 
 965 So.2d at 1030 (¶ 28). Our supreme court has also provided a definition for both “deliberate” and “design” in the context of deliberate-design murder: “As defined by dictionaries the word ‘deliberate’ always indicates full awareness of what one is doing, and generally implies careful and unhurried consideration of the consequences. ‘Design’ means to calcu
 
 *720
 
 late, plan, contemplate. These are general and accepted meanings of these words.”
 
 Windham,
 
 520 So.2d at 126.
 

 ¶ 34. In the present case, Jackson found out about his wife’s infidelity approximately two weeks before Strickland’s murder. After unintentionally encountering Strickland at a gas station, Jackson went to his vehicle and retrieved a knife. According to at least one witness, Jackson concealed the knife in his clothing before approaching Strickland. Another witness testified that Jackson’s initial attack on Strickland was so severe that Strickland’s internal body organs were visible outside of his body. Jackson then got in his vehicle and followed Strickland across the street, where Jackson exited the vehicle and stabbed at an unresisting Strickland multiple times. After the attack, Jackson drove away from the scene and deposited the knife in the middle of a driveway. Once home, Jackson took off his bloody clothing and placed it in a washing machine, although he did not turn the machine on. Jackson claimed at trial that he was in a sort of fugue state during the attack and that he was unable to pinpoint when he came to his senses. He also did not mention the blackout to the detective who interviewed him shortly after the stabbing.
 

 ¶ 35. Under these circumstances, we find no error with the circuit court’s denial of Jackson’s motion for a directed verdict. There is sufficient evidence from which reasonable persons could conclude that Jackson acted with deliberate design when he attacked and killed his wife’s lover. The evidence is such that, giving the State the benefit of all reasonable inferences therefrom, reasonable jurors could find that each element of the crime of deliberate-design murder was proved beyond a reasonable doubt.
 

 ¶ 36. This contention of error is consequently without merit.
 

 b. Weight of the Evidence
 

 ¶ 37. According to the Mississippi Supreme Court, when confronted with a claim that the conviction in a case is contrary to the overwhelming weight of the evidence, “we defer to the discretion of the trial judge, and ‘we will not order a new trial unless convinced that the verdict is so contrary to the overwhelming weight of the evidence that ... to allow it to stand ... would be to sanction an unconscionable injustice.’ ”
 
 Long v. State,
 
 33 So.3d 1122, 1125 (¶ 5) (Miss.2010) (quoting
 
 McLendon v. State,
 
 945 So.2d 372, 385 (¶ 40) (Miss. 2006)).
 

 ¶ 38. For the same reasons that we found that the evidence in this case is sufficient, we also find that allowing Jackson’s murder conviction to stand does not sanction an unconscionable injustice. Accordingly, this contention of error is without merit.
 

 ¶ 39. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HARRISON COUNTY.
 

 KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.