# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-KA-00255-COA

KENNETH BRIAN WEAVER A/K/A KENNETH                    APPELLANT
WEAVER A/K/A KENNETH B. WEAVER

v.

STATE OF MISSISSIPPI                                              APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 02/09/2017 |
| TRIAL JUDGE: | HON. LESTER F. WILLIAMSON JR. |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | PHILLIP BROADHEAD |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: KATY TAYLOR GERBER |
| DISTRICT ATTORNEY: | BILBO MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 09/25/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., WILSON AND TINDELL, JJ.**

**IRVING, P.J., FOR THE COURT:**

¶1.     Kenneth Brian Weaver was convicted of second-degree murder and sentenced to a term of forty years in the custody of the Mississippi Department of Corrections (MDOC), with ten years suspended and five years of supervised probation. He now appeals, asserting two issues: (1) whether the trial court erred in overruling his motion for a directed verdict or, in the alternative, his motion for a new trial; and (2) whether the trial court erred in refusing his jury instruction on imperfect self-defense. We find no merit in either of these issues;

therefore, we affirm.

FACTS

¶2. At 1:14 p.m. on September 22, 2015, Dusty Hicks discovered a decomposing body floating in the pond on his property in Lauderdale County. A half-filled paint-thinner jug had been tied to the body with a piece of rope. Dusty immediately called 911. He suspected that the body belonged to Sara Lynn Beard (also known as Sara Lynn Mullett), as she had been reported missing a few days prior. Dusty had met Sara, through her live-in boyfriend, Weaver, in the six months before her disappearance. Dusty later testified at trial that Weaver had been to Dusty's property during those six months before Sara went missing, and that Weaver was familiar with Dusty's property. Investigator Karey Williams with the Lauderdale County Sheriff's Department was the first to respond to the scene after Dusty's 911-call. Investigator Williams testified at trial that the pond was separated from the road by dense trees. Investigator Williams maintained that "you would never know there was a pond there unless somebody took you back there and showed it to you." The body was later identified as Sara's.

¶3. Earlier that morning, around 6:00 a.m., Investigator Williams had performed a "welfare check" on Sara—whose body had not yet been found and who was still being characterized as a missing person—by visiting the home that she shared with Weaver in Meridian, Mississippi. Investigator Williams testified that, during this welfare check, Weaver told him that he and Sara had visited the casino in Philadelphia, Mississippi, on

2

Thursday night, September 17, 2015. Weaver told Investigator Williams that the two had gambled off and on through the night and into the next morning. At some point, Weaver and Sara argued because he wanted to leave, while she wanted to stay. Weaver told Investigator Williams that he ultimately left Sara at the casino, and suggested that Sara must have found another man to leave with. Investigator Williams testified that Weaver acted nervous during their conversation, and he noted that Weaver had bruises on his arm.

¶4. After Sara's body was discovered, police returned to Weaver and Sara's home, and Weaver voluntarily went with them for questioning. Upon arriving to the sheriff's department, Weaver waived his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966) and gave an oral statement that was largely identical to what he had initially told Investigator Williams. Shortly after giving the oral statement, Weaver gave a written statement wherein he said that he and Sara arrived at the casino on Friday night, September 18, 2015, rather than Thursday night, September 17, 2015.

¶5. Investigator David Rosenbaum next interviewed Weaver. Investigator Rosenbaum informed Weaver that the casino had provided the police with video surveillance showing that Weaver and Sara left the casino together. Investigator Rosenbaum also informed Weaver that Sara's body had been found. At this point, Weaver gave another statement, wherein he admitted that he and Sara left the casino together.[1] He further stated that when they left the casino, Sara began hitting him and grabbed at the guns that he kept in his truck.

---

[1] A still of the video was introduced at trial, which depicted Weaver's truck leaving the parking lot at 4:10 p.m. on Friday, September 18, 2015, with Sara driving.

3

Weaver reduced this statement to writing. Investigator Rosenbaum told Weaver that his statement still failed to explain what happened, so Weaver provided a third statement. In this version, Weaver said that, as Sara was driving his truck, she began hitting him and firing gunshots. She pulled the truck over near a pond. Weaver maintained that as he was attempting to retrieve the gun from Sara, it fired, and a bullet struck her in the head. Like the first and second statements, Weaver reduced this third statement to writing in which he claimed that after shooting Sara, he "panic[k]ed and tried to put her in a tranquil place in a pond within just a few yards from where she pulled over . . . ."

¶6.     Several days later, Weaver sent word through a corrections officer that he wished to speak to Investigator Dylan Anderson, with whom Weaver allegedly had attended school. Investigator Anderson testified at trial that Weaver again waived his *Miranda* rights and gave yet another statement, wherein he said that he and Sara argued about leaving the casino, finally agreed to leave, and were traveling south on Highway 19—with Sara driving—when they pulled over near Collinsville. Weaver maintained that Sara was reaching for his guns in the truck and that she sprayed him in the face with a can of pepper spray that he kept in the driver's side door compartment of the truck. At that point, he raised his gun and shot her. Weaver stated that he pushed her body into the passenger's seat, got into the driver's seat, and continued driving toward Collinsville, where he pulled over and placed Sara's body in a pond. Investigator Anderson testified at trial that Weaver never said anything about any pond except for the one in Lauderdale County, where Sara's body was found. Investigator

4

Anderson further testified that Weaver had mentioned fishing at the pond on Dusty's property where Sara's body was found, which is how Weaver knew it existed. Weaver did not reduce this statement to writing.

¶7. Weaver was indicted for second-degree murder on March 31, 2016. He pleaded not guilty, and the trial commenced in February 2017. Stacy Jones, a forensic scientist with the Mississippi Bureau of Investigations, testified that she processed Weaver's truck. She stated that she found no bullet holes in the vehicle, but that there were small bloodstains scattered throughout. From the vehicle, she recovered a can of pepper spray, a .380-caliber handgun, and a five-round .38-caliber handgun, which contained four live rounds and one spent-shell casing. The pepper spray and the .380-caliber handgun were both recovered from the driver's side door compartment.

¶8. John Brentley Davis, Deputy Chief Medical Examiner for the State of Mississippi, performed Sara's autopsy. He testified that he believed the cause of Sara's death to be a single gunshot wound to her head and that the manner of death was homicide. He further testified that the evidence suggested that the gun was fired from a distance of greater than two or three feet. He also noted that the toxicology report indicated that Sara had methamphetamine and a metabolite of fluoxetine (found in Prozac) in her system when she died.

¶9. The State also called Investigator Rosenbaum, who testified generally about the role that he played in the investigation of Sara's death, including the interviews of Weaver that

5

he conducted. During cross-examination of Investigator Rosenbaum, Weaver's counsel questioned him about Weaver's cell-phone records. Investigator Rosenbaum acknowledged that four calls appeared to have been made from Weaver's cell phone to 911—specifically, the Neshoba County 911-dispatch center—on September 18, 2015, at 2:53 p.m., 2:56 p.m., 2:57 p.m., and 3:15 p.m. The call taking place at 2:57 p.m. lasted for fifty-four seconds; however, the rest of the calls each lasted ten seconds or fewer. Investigator Rosenbaum testified that he never followed up with the Neshoba County 911-dispatch center regarding the phone calls.

¶10. After the State rested its case-in-chief, the defense moved for a directed verdict, which was denied. The defense then presented testimony from Debbie Reid, one of Dusty's neighbors, who stated that she had not noticed anything unusual occurring on Dusty's property on September 18-21, 2015. The defense next called Eddie Crosby, a private investigator, who testified that the GPS coordinates associated with the four phone calls to 911 from Weaver's cell phone indicated that the calls took place in Neshoba County. Crosby also identified several photographs of a pond located beside Highway 19 in Neshoba County, which the defense later suggested was where the shooting actually took place. Crosby stated that the pond in the photograph was located approximately fifteen miles from the casino.

¶11. Finally, the defense called Weaver to testify. He maintained that around 6:30 or 7:00 p.m. on Thursday, September 17, 2015, he and Sara arrived at the Silver Star Resort and Casino. They gambled until midnight or 1:00 a.m., at which time Weaver returned to his

truck in the parking lot to sleep and wait for Sara. In the meantime, Sara was going back and forth from the Casino to Weaver's truck. According to Weaver, he and Sara argued into the next day about leaving the casino, and he finally convinced her to leave with him around 4:00 or 5:00 p.m. on Friday, September 18, 2015. Weaver testified that, before leaving the casino parking lot, Sara had attempted to pull a shotgun from the roof rack of his truck. He stated that he took the shotgun from Sara, ejected the shells, and laid it down in the back of the truck. Weaver testified regarding the 911 calls that he placed from his cell phone: first, he contended that he called 911 three times after the shotgun incident but that he got no response. Then, he testified that he connected with 911 a couple of times and explained the situation, but law enforcement never came to the casino. Finally, Weaver testified that he connected with 911 only one of the four times he called. Again, he maintained that no law enforcement came to the casino in response to his calls.

¶12.    Weaver testified that, upon finally leaving the casino, Sara insisted on driving, so he sat in the passenger's seat. According to Weaver, Sara began hitting him and driving erratically, so he threw the truck out of gear and pulled it over to the side of Highway 16, just a mile and a half from the casino. Weaver testified that he and Sara continued arguing; then she sprayed him in the face with pepper spray. Weaver stated that he knew Sara often carried a small .380-caliber handgun with her and was concerned that she would reach for it next. Weaver then drew his .38-caliber handgun and, according to him, as he was pulling the hammer back, the hammer slipped, the gun fired, and a bullet hit Sara in the head. Weaver

7

maintained that he did not point the gun at Sara.

¶13.    Weaver testified that he attempted to flag down a vehicle, but no one stopped. He walked over to a pond[2] that was approximately 150 yards away—but not the same pond that he ultimately dumped Sara's body in—and rinsed the pepper spray off of his face. After about two hours, he got back into the truck and moved Sara's body into the passenger seat. Weaver then testified that he decided to drive Sara's body to the pond located on Dusty's property. When asked why he did not tell law enforcement that the shooting was an accident, Weaver claimed that he had been traumatized from the experience.

¶14.    After Weaver's testimony, the defense rested its case-in-chief and renewed its motion for a directed verdict, which the trial court denied. The court instructed the jury on second-degree murder and self-defense. The jury found Weaver guilty of second-degree murder but declined to sentence him to life in prison. The trial court sentenced Weaver to forty years in MDOC's custody, with thirty years to serve, ten years suspended, and five years of probation. Weaver filed a motion for a judgment notwithstanding the verdict (JNOV) or, alternatively, a new trial, which the trial court denied. Weaver filed a timely notice of appeal.

## DISCUSSION

I.    *Motion for JNOV/New Trial*

    a.    *Sufficiency of the Evidence*

---

[2] The State notes in its appellate brief that Weaver's testimony regarding this pond differs from Crosby's testimony; Weaver testified that the pond was only a mile and a half from the casino, but Crosby testified that the pond was fifteen miles from the casino.

¶15. Our appellate courts have consistently reviewed motions for a JNOV or a directed verdict under the following standard:

> A motion for directed verdict challenges the sufficiency of the evidence, and the critical inquiry is whether the evidence shows beyond a reasonable doubt that the accused committed the act charged, and that he did so under such circumstances that every element of the offense existed. In judging the sufficiency of the evidence, the trial judge is required to accept as true all evidence that is favorable to the State, including reasonable inferences that may be drawn therefrom, and to disregard evidence favorable to the defendant.

*Jackson v. State*, 68 So. 3d 709, 719 (¶32) (Miss. Ct. App. 2011) (citations and internal quotation marks omitted).

¶16. Weaver argues that the trial court erred in refusing his motion for a directed verdict on the basis that the State had not sufficiently established that the crime took place in Lauderdale County. In response, the State contends that the fact that Sara's body was found in a pond in Lauderdale County is sufficient evidence for a jury to find that the crime occurred in Lauderdale County.

¶17. "Proof of venue is an essential part of criminal prosecution, and the State bears the burden of proving venue beyond a reasonable doubt." *Hill v. State*, 797 So. 2d 914, 916 (¶10) (Miss. 2001). Mississippi Code Annotated section 99-11-19 (Rev. 2015) provides that:

> When an offense is committed partly in one county and partly in another, or where the acts, effects, means, or agency occur in whole or in part in different counties, the jurisdiction shall be in either county in which said offense was commenced, prosecuted, or consummated, where prosecution shall be first begun.

"While the ultimate burden of proving venue that rests upon the State is beyond a reasonable

9

doubt, this is a standard of proof before the jury, not the trial judge." *Hill*, 797 So. 2d at 916 (¶11).

¶18.    Both Weaver and the State cite *Hill v. State*, 797 So. 2d 914, 916 (Miss. 2001).  In *Hill*, the defendant was convicted of strangling her infant son. *Id*. at 914 (¶1).  The defendant argued that the trial court committed reversible error in refusing to grant her motion for a directed verdict on the basis that the State had failed to prove that venue existed in Forrest County, Mississippi, where the case was brought. *Id*. at 915-16 (¶9).  The Court held that the evidence presented at trial was sufficient to establish venue in Forrest County, stating, "[a]s long as the evidence is sufficient to lead a reasonable trier of fact to conclude that the crime in the present case occurred at least partly in Forrest County, then the evidence of venue is sufficient." *Id*. at 916 (¶12).

¶19.    Weaver contends that "it was clearly established in the evidence that the homicide took place in Neshoba County."  We disagree.  We acknowledge Weaver's testimony that he shot Sara in his truck about a mile from the casino near a pond.  However, given the totality of the evidence, including his pretrial statements and other testimony, the assertion that the evidence clearly established that the homicide took place in Neshoba County is not undergirded.  First, as noted, Sara's body was found in a pond in Lauderdale County, not in Neshoba County.  Second, in Weaver's third statement, he said that after shooting Sara, he "panic[k]ed and tried to put her in a tranquil place in a pond within just a few yards from where she pulled over . . . ."  According to Weaver's trial testimony, he snatched the truck

10

out of gear and pulled it over to the side of the road approximately a mile from the casino in Neshoba County. Weaver does not claim, and there is no evidence in the record, that Sara's body had been relocated from a pond in Neshoba County to the pond in Lauderdale County where it was found. Additionally, Crosby, a defense witness, testified that he located a pond[3] in Neshoba County approximately 100 to 150 yards off of Highway 19 and approximately fifteen miles from the casino. It is interesting that the pond that Weaver said he walked to to wash the pepper spray off his face after he shot Sara was approximately 150 yards from the highway (the same distance from the highway to the pond found by Crosby), except that Weaver identified the highway as Highway 16, while Crosby identified the highway as Highway 19. In light of this evidence and the fact that Sara's body was found in Lauderdale County, a jury could reasonably find or conclude that the killing took place in Lauderdale County because the jury was required to view the evidence in the light most favorable to the State.

¶20. Weaver admits that a "rebuttable presumption" was raised that the killing took place in Lauderdale County because Sara's body was recovered there, but he contends that he rebutted the presumption. See *Fairchild v. State*, 459 So. 2d 793, 799 (Miss. 1984), for the proposition that the fact that a body is found in a certain county "raises a rebuttable presumption, or supports an inference, that all or part of the homicide took place in [that county]."

_____

[3] This was not the pond in which the body was found.

11

¶21. After hearing arguments from both sides regarding this issue, the trial court cited *Fairchild*, and held:

> But - - no question but that [Sara] was found in Lauderdale County. There is [a] rebuttable presumption under the law that all or part of the homicide took place in Lauderdale County under those circumstances.
>
> And I think that's what the jury is going to have to determine. Where there is - - there is testimony here that there was an argument, there was pepper spray, and then there was - - at least his version is - - and that occurred up in Newton County [sic]. And then there [are] other statements that [Weaver] has given that they stopped in Lauderdale County where he killed her. He said differently yesterday.
>
> I mean, there [are] different versions presented, but there is a legal presumption that where the body was found, that all or part of the crime happened here. That's an issue of argument.

¶22. As noted earlier in this opinion, the question whether venue has been established in a given case is a question for the jury, not the trial judge. Instruction S-1A placed the issue of venue before the jury for its consideration. It instructed the jury that the State was required to prove, among other elements, that the killing took place in Lauderdale County and that if the State should fail to do so, the jury should find Weaver not guilty. The jury is the final arbiter of the evidence, and it was not obligated to accept Weaver's testimony that he shot Sara in Neshoba County in light of the fact that her body was found in Lauderdale County in a pond where he admitted that he placed it. *Cf. Burrell v. State*, 613 So. 2d 1186, 1191 (Miss. 1993) (noting our well-settled law that a jury is under no obligation to accept an alibi defense asserted by the accused and his witnesses). As stated, there was sufficient evidence for the jury to conclude that the killing occurred in Lauderdale County. Therefore,

12

we cannot say that the trial court erred in refusing to grant Weaver's motion for a directed verdict on the basis that the State failed to prove a crucial element: that the homicide occurred in Lauderdale County. This issue is without merit.

### b. *Weight of the Evidence*

¶23. When reviewing whether a conviction in a case is contrary to the overwhelming weight of the evidence, "we defer to the discretion of the trial judge, and we will not order a new trial unless convinced that the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would be to sanction an unconscionable injustice." *Jackson*, 68 So. 3d at 720 (¶37) (internal quotation marks omitted). As we do not find that allowing the verdict to stand would sanction an unconscionable injustice, it follows that we find no merit to this issue, and the trial court did not err in not granting a new trial based on the weight of the evidence. This issue likewise is without merit.

### II. *Jury Instruction*

¶24. Weaver argues that the trial court erred in refusing the defense's proposed jury instruction D-7 because it was a correct statement of law that would have been used to establish the defense's theory of imperfect self-defense. In response, the State argues that there was no foundation in the evidence for an imperfect self-defense instruction and that the trial court did not err in refusing instruction D-7.

¶25. "Jury instructions are reviewed under an abuse-of-discretion standard. When read together, if the jury instructions state the law of the case and create no injustice, then no

13

reversible error will be found." *Burgess v. State*, 178 So. 3d 1266, 1272 (¶14) (Miss. 2015) (citation and internal quotation mark omitted). "Imperfect self-defense is a theory that can reduce [an] intentional killing[] from murder to manslaughter where the killing is committed without malice but under a bona fide (but unfounded) belief that it was necessary to prevent great bodily harm." *Young v. State*, 99 So. 3d 159, 165 (¶21) (Miss. 2012) (internal quotation mark omitted). In contrast, "manslaughter is the 'killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense.'" *Id*. (quoting Miss. Code Ann. § 97-3-35 (Rev. 2006)).

¶26.    Instruction D-7 provides:

> If you find beyond a reasonable doubt that Kenneth Brian Weaver killed Sara Lynn Beard aka Sara Lynn Mullett without malice while under a bona fide, but unfounded, belief that the killing was necessary to prevent death or great bodily harm, then you shall find Kenneth Brian Weaver guilty of [m]anslaughter.

In denying D-7 at trial, the trial court held:

> I have already said that I don't believe we have got a case of manslaughter. He didn't - - it is either self-defense or a reckless act evidencing disregard for human life. He was either protecting himself in the way that's justified in the opinion of the jury or he acted recklessly and resulted in the death of [Sara].

The defense responded with the following argument:

> [T]he State is not even alleging that malice is present, so we don't even have to consider that part. They are alleging and have offered proof that they believe that it is an intentional killing, and I have put on proof that I believe demonstrates that the Defendant had a bona fide belief that his use of force was necessary to prevent death or great bodily harm. In the event that the jury

14

believes that that belief was bona fide, then yes, he is entitled to self-defense.

But what this [c]ourt is saying is that the parenthetical "but unfounded" should be written out of the law and the jury should not consider what he should be convicted of if they believe that his belief was bona fide but unfounded. If he believed that he needed to use the force he used, but it was unreasonable for him to have done so and it was an unfounded belief, then the law allows a conviction for manslaughter under an imperfect self-defense theory.

The State, in response, argued:

Well, he withdrew D-6 which is his manslaughter instruction, so there is no basis that deals with the issue of manslaughter that would reduce this to manslaughter. Furthermore, this just doesn't rise to even the level of imperfect self-defense. The Defendant specifically testified he didn't see a gun. Pepper spray is not enough to get into imperfect self-defense, not when you are the one holding the gun.

In fact, in one of the statements that he made he said he shot her with the .380 himself, so that means he knew that she didn't have it.

Subsequently, the court denied instruction D-7. However, the court gave jury instruction C-8, which instructed the jury as follows regarding self-defense:

The [c]ourt instructs the [j]ury that one claiming self-defense may not use more force than reasonably appears necessary to save his own, or another's, life or protect himself or others from great bodily harm under the circumstances as they exist as the time of the incident. Whether or not the defendant exceeded that amount of force is for you, the [j]ury, to determine.

¶27. "A defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Chandler v. State*, 946 So. 2d 355, 360 (¶21) (Miss. 2006). The record is clear that instruction D-7 was not covered by other instructions, nor is it an incorrect

15

statement of our law. Therefore, we will limit our discussion to whether there is an evidentiary foundation to support the instruction.

¶28. We first note that the theory of imperfect self-defense embodies an intentional killing, although without malice. A killing that occurs as a result of an accident when the defendant had no intent to kill the victim implicates the defense of accident but not the defense of imperfect self-defense because, by definition, an incident that occurs as a result of an accident is not the product of an intentional act. One may argue that the act of pulling the hammer back indicates an intention to shoot Sara,[4] but the more plausible view is that that

---

[4] Apparently the dissent interprets this statement as a concession by the majority that it believes a reasonable jury could find Weaver shot Sara intentionally. Although the jury could conceivably find that Weaver shot Sara intentionally, it could not find, based on the evidence presented, that Weaver shot Sara because he believed in that moment that shooting Sara was necessary to save his own life. As demonstrated by the State's cross-examination of Weaver, his own testimony debunks any notion of intentionality in the moment at which Sara was shot. In support of Weaver's theory of imperfect self-defense, the only version of the shooting that was before the jury was the version that Weaver testified to in court, wherein he stated that the shooting was purely an accident, not the various pretrial versions that he gave to law enforcement officers during their investigation of the crime.

Apparently, it is the view of the dissent that Weaver's fourth out-of-court reiteration of what allegedly occurred was a sufficient evidentiary basis for an imperfect self-defense instruction because it says:

> Our supreme court has repeatedly held that in a criminal prosecution the jury may accept the testimony of some witnesses and reject that of others, and that they may accept in part and reject in part the evidence on behalf of the State or on behalf of the accused. The jury can disregard any portion of the evidence either for the [S]tate or for the defendant.

Dissenting op. n.5. (citations and internal quotation marks omitted). With respect, we must say that this is not a case where different witnesses gave different versions of what occurred.

16

action was simply preparing the gun for a quick shot should the situation advance to a point where Weaver thought it was necessary to shoot Sara to preserve his life. Weaver's testimony on cross-examination demonstrates that that was indeed the case, as his testimony is clear that when he pulled his revolver, he neither intended to shoot Sara nor pointed the gun at her:

> Q. Well, you testified that she sprayed you with pepper spray and you shot her. You didn't say you saw her with a gun. You said you knew she had one, but you didn't see her with it.

> A. I couldn't see after the cayenne pepper spray was in my eyes. The gunshot just happened to strike her in the face. *It was not a pull-point-shoot situation*.

> Q. Well, help me here. If you're about as far away from her as I am from this part of this podium and -- can you give any other explanation as to how she got shot in the face other than you pointing the gun at her face and pulling the trigger?

> A. Yes, sir. Being a revolver made in 1967 with a hammer that's almost flat, while withdrawing that hammer those hammers on those particular revolvers are capable of slipping. While I was holding that revolver and pulling the hammer back, it slipped from -- and that's the reason. That explains the shot and the two foot from the -- *there wasn't a point. If I would have pointed a gun at her in a pickup truck, it would have been point-blank range and not a two-, three-foot shot*.

> Q. Well, I missed that part in your direct examination. I didn't hear you tell your lawyer that. *So you're saying now that the thing slipped*?

> A. *Yes.*

> Q. *And to be clear, though, you were pulling the hammer back*?

> A. To ready the revolver, yes.

Q. Excuse me?

A. *To ready the revolver. To - -*

Q. To raise the revolver?

A. *- - taking the safety off of an automatic.*

Q. Is this a single-action or double-action pistol?

A. A double-action.

Q. *So you could have just pulled the trigger to shoot her.*

A. *Yeah, but I was not really figuring on doing that.* I don't really remember my frame of mind, but I definitely didn't think it would -- you know, it wasn't a planned -- that was the last thing I hoped that would happen by far.

Q. The last think you hoped would happen? Do you know how to prevent something like that? Do you know that if you just don't point the gun at her and point it at her face from two feet, three feet away that it can't happen?

A. *Yes, sir. It was a very bad mistake* and it was an unsafe act, and I felt like my life was in danger because of her having the pistol, the .380 on her person. I felt like that was the next thing that would come in my direction.

Q. Well, it wasn't just an unsafe act, was it? I mean, it was a very dangerous act to point a gun at somebody and pull the hammer back on it?

A. *I didn't point it.* It could have just as easily went through the window or any other direction from this, you know, from --

Q. How can you sit there and tell this jury that you didn't point that gun at her when we know that you had the gun in your hand and the bullet went through her cheek? How can you say the gun wasn't pointed at her?

18

A.     Forensic evidence proves it went in at the jaw here and come here (indicating). If I would have pointed the gun at her from her from the passenger side seat, I would have been within a foot, and it would have been straight, you know, straight across and not up and back.

Q.     Thank you, Dr. Weaver [sic]. But isn't it true that whichever way she was facing would determine where that bullet went?

A.     Yes, those are determining factors as well.

Q.     I think your attorney asked you the question in this form: Do you admit that you held the gun that fired the shot? And you said "yeah" or something, I don't know. But do you acknowledge now that you killed her by shooting her in the face with that gun?

A.     I did.

Q.     And when I say "that gun," I'm talking about this one right here, which is Exhibit Number 20? This gun, right?

A.     Correct.

Q.     All right. You gave a boatload of statements to the law enforcement officers. Why, if this was an accident or if it was self-defense even, did you not, when making these statements to them, tell them what you told this jury under oath today?

A.     I was still very unclear of a lot of things at that time. It was a very traumatic experience.

Q.     Well, do you think it was traumatic for her?

A.     Very.

Q.     All right. Anymore reasons why you didn't tell the officers what you now claim is the truth?

A.     Some things I was unclear about at the time and I guess guilt.

Q.     Well, I mean, you were -- yeah, guilt. Sure. But, I mean, you were

19

lucid enough to make up about half a dozen different stories, weren't you?

A.    Yes.  Some things I said was incorrect, yes.

Q.    Some things you said were incorrect?

A.    Yes, sir.

Q.    How about just darn near everything you said was incorrect?  They were flat-out lies, weren't they?

A.    Yes, sir.

Q.    You were trying to cover it up, you were trying to cover up what you had done; is that not true?

A.    That's true.

Q.    And do you know of any reason why anybody who is not guilty of something would do that?

A.    I can't explain. No, I can't explain my mindset at that time.

(Emphasis added).

¶29.   What is clear from the quoted colloquy is that despite the prosecutor's best efforts to get Weaver to admit that he intentionally shot Sara, he steadfastly denied that was the case, although he also insisted that he was afraid and believed that Sara would next pull the .380 revolver that, according to Weaver, she always carried. Again, without evidence of an intentional shooting, there can be no entitlement to an imperfect self-defense instruction.

¶30.   Also, the events immediately preceding the shooting do not provide an evidentiary basis for the giving of an imperfect self-defense instruction because there is not one scintilla

20

of evidence that could be interpreted as supportive of the notion that Weaver could have believed—in the moment that he shot Sara—that shooting her was necessary to save his own life or prevent great bodily harm to himself. He said he did not see a gun. Admittedly, he said Sara sprayed him with pepper spray, but he does not claim that she threatened to kill him at the time that she sprayed him with the spray. He does, however, say that he believed that she would next retrieve her gun, but that belief was not founded on anything she had said or done immediately prior to the shooting. It was simply Weaver's speculation of what might happen next because, in his words, she was known to carry a gun. Importantly, what he did not say is that she always pulled the gun on him whenever they got into an argument, and that was the reason he suspected that she would pull the gun next. Perhaps he could not say that because the record indicates that Sara had owned the gun for a mere two weeks prior to her death, and there is no history in the record of their relationship during that two-week period. The foundation for a jury instruction must be grounded in the evidence, not in the mind of a defendant speculating about what a victim might have been contemplating in the absence of evidence pointing in that direction.

¶31. In accordance with the foregoing discussion, we find no evidentiary basis to support the giving of instruction D-7. Therefore, we find no error in the trial court's refusal to give it. This issue is without merit.

¶32. **AFFIRMED.**

**LEE, C.J., GRIFFIS, P.J., BARNES, WILSON, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR. FAIR, J., DISSENTS WITH SEPARATE WRITTEN**

21

**OPINION, JOINED BY CARLTON, J.**

**FAIR, J., DISSENTING:**

¶33.    Kenneth Weaver gave several different accounts of what happened the afternoon he shot Sara Beard. The story he eventually settled on—the one he testified to at trial—was that Sara blinded him with pepper spray and he, believing she was armed and intended to shoot him, drew his gun and inadvertently shot her while trying to cock it. Weaver requested a jury instruction on his theory of imperfect self-defense—that he shot Sara "without malice but under a bona fide (but unfounded) belief that it was necessary to prevent death or great bodily harm." *Brown v. State*, 222 So. 3d 302, 307 (¶21) (Miss. 2017). The majority appears to concede that a reasonable juror could find Weaver shot Sara intentionally,[5] but it goes on to find Weaver's claim about his fear of her shooting him first to be utterly unsupported by the evidence. Respectfully, I disagree—Weaver's story may be dubious, but it was enough to have the jury instructed on his theories of the case.

¶34.    Weaver claimed he and Sara had been at a casino for almost twenty-four hours and

---

[5] In earlier versions of the story, Weaver apparently admitted he shot Sara on purpose. Our supreme court has "repeatedly held that in a criminal prosecution the jury may accept the testimony of some witnesses and reject that of others, and that they may accept in part and reject in part the evidence on behalf of the [S]tate or on behalf of the accused." *Mangum v. State*, 762 So. 2d 337, 346 (¶35) (Miss. 2000). The jury can "disregard any portion of the evidence either for the state or for the defendant." *Martin v. State*, 112 Miss. 365, 374-75, 73 So. 64, 66 (1916). Likewise, Weaver was entitled to have the jury instructed on both accident and imperfect self-defense; he had "a right to assert alternative theories of defense, even inconsistent alternative theories." *McTiller v. State*, 113 So. 3d 1284, 1292 (¶26) (Miss. Ct. App. 2013) (quoting *Reddix v. State*, 731 So. 2d 591, 593 (¶9) (Miss. 1999)).

had spent quite a bit of time arguing about when they would leave, with Sara wanting to stay. Weaver slept in their vehicle overnight, but she apparently had not slept, or slept quite a bit less than he did, and he said she had been using drugs or "supplements" that caused her to act erratically. That afternoon, they argued in the parking lot for some time, and Sara pulled a shotgun from a rack in the vehicle. Weaver was able to take it from her and unload it. He said he thought she had intended to shoot him and called 911 four times, but the calls kept dropping.

¶35. About an hour later, Sara agreed to go home, but she insisted on driving. She was still angry, though, and shortly after leaving she began driving erratically while repeatedly striking Weaver, who was sitting in the passenger seat beside her (Weaver said this explained the bruising found on his arm after he was arrested). Sara accelerated rapidly, well past 85 miles per hour, and Weaver thought she was deliberately endangering their lives. So he threw the vehicle into park and pulled it over to the side of the road. Weaver said this maneuver was violent enough that he thought it had caused irreparable damage to the vehicle. They continued to argue, and after a few minutes, Sara sprayed him in the face with pepper spray. Weaver testified that, at that moment, he was blinded, but he thought about how she had pulled the shotgun back at the casino and about the .380 pistol she had recently gotten and regularly carried. He believed she was about to shoot him while he was incapacitated, so he drew his own pistol and shot her when his finger slipped off the hammer while trying to cock it.

23

¶36. The majority holds that Weaver was not entitled to an instruction on imperfect self-defense because "there is not one scintilla of evidence" he could have believed he was in danger and his supposed fear "was not founded on anything she had said or done immediately prior to the shooting." I cannot join in this conclusion.

¶37. "In homicide cases, the trial court should instruct the jury about a defendant's theories of defense, justification, or excuse that are supported by the evidence, no matter how meager or unlikely." *Brown v. State*, 39 So. 3d 890, 899 (¶34) (Miss. 2010). Weaver said Sara had pulled a shotgun on him before they left the casino—about an hour before—and had just deliberately endangered their lives by driving recklessly at a high rate of speed—a few minutes before. Although these were not things she did "immediately" before the shooting, they do not have to be; "evidence of prior violent acts of the victim . . . are . . . relevant . . . to show the defendant's state of mind at the time of the incident and the reasonableness of his use of force." *Jordan v. State*, 211 So. 3d 713, 717 (¶17) (Miss. Ct. App. 2016) (citing *Richardson v. State*, 147 So. 3d 838, 842 (¶16) (Miss. 2014)). Weaver said he knew Sara carried a pistol, which she had recently acquired, and he said he feared she was going to use it against him like she had tried to use the shotgun. And immediately before the shooting, Sara had blinded him with pepper spray, which prevented Weaver from defending himself as he had in her two previous attempts. This was more than enough to entitle Weaver to an imperfect self-defense instruction, which, again, should have been given if supported by the evidence, "no matter how meager or unlikely." *Brown*, 39 So. 3d at 899 (¶34).

24

¶38. "[E]very accused has a fundamental right to have her theory of the case presented to a jury, even if the evidence is minimal." *Chinn v. State*, 958 So. 2d 1223, 1225 (¶13) (Miss. 2007). Weaver's story may be dubious, but his credibility was an issue for the jury, not an issue for the court. The imperfect self-defense theory was supported by the evidence and should have been submitted to the jury. Our courts "greatly value the right of a defendant to present his theory of the case," "and where the defendant's proffered instruction has an evidentiary basis, properly states the law, and is the only instruction presenting his theory of the case, refusal to grant it constitutes reversible error." *Id.* I would reverse Weaver's conviction and remand for a new trial, and so I dissent.

**CARLTON, J., JOINS THIS OPINION.**