# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00052-COA

**BRITTANY CARTER**                                                          **APPELLANT**

v.

**STATE OF MISSISSIPPI**                                                     **APPELLEE**

DATE OF JUDGMENT:            01/06/2023
TRIAL JUDGE:                 HON. BETTY W. SANDERS
COURT FROM WHICH APPEALED:   HINDS COUNTY CIRCUIT COURT,
                             FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:      OFFICE OF STATE PUBLIC DEFENDER
                             BY: JUSTIN TAYLOR COOK
ATTORNEY FOR APPELLEE:       OFFICE OF THE ATTORNEY GENERAL
                             BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY:           JODY EDWARD OWENS II
NATURE OF THE CASE:          CRIMINAL - FELONY
DISPOSITION:                 AFFIRMED - 05/07/2024
MOTION FOR REHEARING FILED:

### BEFORE BARNES, C.J., WESTBROOKS AND EMFINGER, JJ.

### EMFINGER, J., FOR THE COURT:

¶1.     On November 8, 2021, a Hinds County grand jury returned an indictment against Brittany Carter for first-degree murder. After a four-day trial, a jury found Carter guilty of the lesser-included offense of second-degree murder. Carter was sentenced to forty years, with ten years suspended and thirty years to serve, in the custody of the Mississippi Department of Corrections. On appeal, Carter argues that the trial court erred by refusing to give a jury instruction on excusable homicide tracking Mississippi Code Annotated section 97-3-17 (Rev. 2020). Secondly, Carter argues that the "evidence presented at trial [was] insufficient to overcome the presumption that Carter acted in reasonable self-defense."

**FACTS AND PROCEDURAL HISTORY**

¶2.     On the morning of March 30, 2017, Brittany Carter drove her children to school, and instead of going home after she dropped off her kids, she drove over to her sister Ashley's house. When she arrived at Ashley's home, nobody answered the door, so Carter got back in her car and left. At trial, Carter testified that as she was leaving Ashley's home and driving up Weeks Street, Chornell Mayfield jumped out from behind some bushes near the front passenger side of Carter's car. According to Carter, Mayfield began to bang on the car door and hood. Carter also claimed that Mayfield was throwing bricks and rocks at the vehicle while screaming profanities. In response to Mayfield's actions, Carter testified as to her own reaction, stating:

> So, [Mayfield] was steadily banging on my car and banging on my car and banging on my car, and I guess, with a brick or whatever she had in her hand. She was banging on my car. And so I just backed my car up, and she was still coming to my car. And I was . . . trying to back up and [Mayfield] was steadily coming up to my car, banging my car, and that is when I revved up trying to get her to the fence – I mean the fence at the house that was straight ahead.

During her initial interview with investigators and again at trial, Carter admitted that she was driving between twenty and forty miles per hour when her car struck Mayfield. While Carter initially testified that she "revved up trying to get [Mayfield] to the fence," Carter later testified that she did not intentionally hit Mayfield; instead, she was scared of Mayfield and what she might do.[1] After Carter struck Mayfield with her car, Carter proceeded to drive her

_____

[1] It was undisputed that Carter and Mayfield were involved in a contentious and ongoing feud stemming from the fact that both Mayfield and Ashley (Carter's sister) had children by the same man, Mike Woods. Woods lived with Ashley, and on the morning of March 30, 2017, Ashley and Woods were asleep inside when Carter initially stopped by the

2

car straight ahead into a fence and through a yard before she turned her car around in the driveway and drove back down Weeks Street. Carter testified that she did not have a cell phone in her car to call for help, and she did not stay at the scene because she feared for her safety. Carter testified that she then drove back to Ashley's house and tried to convince Ashley to pack up her kids and leave with her because she was afraid of what Woods might do to them when he found out that Carter had hit Mayfield with her car. When Ashley would not leave with her, Carter drove back to her own house, where she lived with her mom, uncle, and three children. According to Carter, shortly after arriving home, Woods and several other men showed up in front of her house with guns. Carter called the police in response to men's presence outside her home. When the police arrived, she confessed to hitting Mayfield with her car. Carter was arrested and taken for questioning.

¶3. At Carter's trial, La'Tisha Michael testified for the State. According to Michael, she was walking back into her house from taking her children to school on the morning of March 30, 2017, when she heard a "boom" coming from her front yard. When she looked out her front door, she saw a blue truck pulling out of her yard. Michael testified that she heard one of her neighbors scream, "[S]he [is] dead, she [is] dead." According to Michael, she did not see the person her neighbor was talking about until she walked to the end of her driveway and saw Mayfield on the ground. Michael testified that Mayfield regularly walked around the neighborhood at all hours of the day. Michael stated that she witnessed the blue truck

house. According to Carter, she and Mayfield had had multiple confrontations over the years, the latest of which occurred on the day before the incident central to this appeal, where Mayfield threatened Carter and busted out Carter's passenger side car window with a brick.

drive back up Weeks Street. She witnessed Carter get out of the truck and run up to Ashley's and "Little Mike's" (Woods) front door. She then witnessed Carter come out, get back in her truck, and leave. Michael testified that she immediately ran down the road to Mayfield's relatives' homes to tell them what happened to Mayfield, and people soon began arriving on the scene in front of Michael's home.

¶4. Jacorey Ross also testified at trial. Ross was a high school student at Lanier High School and was walking toward his bus stop on Weeks Street on the morning of March 30, 2017. Ross testified that as he was walking toward his bus stop, he saw Mayfield "get hit." According to Ross, he heard a car engine revving up immediately before Mayfield was hit and identified the vehicle as a "bluish truck." Ross testified that once Mayfield was hit by the truck, he saw her body "fly up in the air and land back on the car." Ross stated that Mayfield's body then bounced off the car and went into the fence in front of Michael's home. According to Ross, Mayfield's head was under the fence. After the blue truck hit Mayfield, Ross stated that the car continued to drive up the fence and out of the driveway. Ross testified that he did not know where the truck went after it left the scene, but he stated, "I was just trying to get away from her." When he was asked to explain what he meant, Ross stated, "She tried to hit me, too." Ross testified that he attempted to run over to Mayfield and see if she was okay, but the driver of the truck tried to hit him. Ross explained that he dodged the truck by running behind a tree in the next yard. Ross testified that the truck came and left the scene in a "fast manner." According to Ross, he observed Mayfield lying on the ground and breathing heavily after the truck left the scene. He did not notice anything in Mayfield's

4

hands and did not witness her throw any objects at the truck. Ross testified that he was able to call Mayfield's family and waited for the police to come to the scene before he left to go to school. Later that day, Ross went to the police station and gave his account of what he had witnessed that morning.

¶5. Mayfield was taken to the University of Mississippi Medical Center (UMMC) for her injuries. According to Dr. Risa Moriarity, Mayfield had "a significant brain injury, with blood in her brain, swelling of the brain. She had bruising of both lungs. She had multiple abrasions and what we would call soft tissue injury, lacerations, abrasions to her face, her chest, all four extremities." Mayfield remained in the intensive care unit at UMMC until April 27, 2017, when she was transferred to Methodist Specialty Care Center (Methodist). Mayfield remained at Methodist until her death on May 7, 2019. Mayfield's mother, Pamela Davis, testified that during those two years Mayfield was unable to speak or communicate. According to Davis, Mayfield was awake, but she could not see and "had w[a]ndering eyes." Davis testified that Mayfield had a feeding tube for nutrition, a catheter for urination, and a "trach" in her neck for air.

¶6. After Mayfield died, Carter was indicted for first-degree murder. After a four-day trial, Carter was acquitted of first-degree murder but convicted of the lesser offense of second-degree murder. Carter was sentenced to the maximum term of forty years in custody, and the court ordered ten years be suspended. Carter's post-trial motion was denied by operation of law, and Carter appealed.

**ANALYSIS**

5

**I. Did the trial court err by refusing Carter's accident instruction?**

¶7. In *Davis v. State*, 18 So. 3d 842, 847 (¶¶14-15) (Miss. 2009), the supreme court stated:

The standard of review when appellate courts consider issues involving jury instructions is well-established. Jury instructions must be read as a whole to determine if the instructions were proper. *Milano v. State*, 790 So. 2d 179, 184 (Miss. 2001). Jury instructions must fairly announce the law of the case and not create an injustice against the defendant. *Id*. This rule is summed up as follows: "In other words, if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law, no error results." *Id*. *See Adams v. State*, 772 So. 2d 1010, 1016 (Miss. 2000).

A defendant has a right to jury instructions that present his theory of the case, but that right is not absolute. "The court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions[ ] or **is without foundation in the evidence**." *Phillipson v. State*, 943 So. 2d 670, 671 (Miss. 2006). Also, jury instructions are within the discretion of the trial court. *Higgins v. State*, 725 So. 2d 220, 223 (Miss. 1998). Finally, when serious doubt exists as to whether an instruction should be included, the doubt should be resolved in favor of the accused. *Stringfellow v. State*, 595 So. 2d 1320, 1322 (Miss. 1992).[2]

(Emphasis added).

¶8. Carter claims that the trial court erred by refusing to give her proposed jury instruction

D-18, which stated:

The Court instructs the jury that the killing of any human being by the act, procurement, or omission of another shall be excusable:

(a) When committed by accident and misfortune in doing any lawful act by lawful means with usual and ordinary caution, and without any unlawful intent;

(b) When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation; or

---

[2] *Stringfellow* was overruled on other grounds by *Nevels v. State*, 325 So. 3d 627, 634 (¶20) (Miss. 2021).

(c) When committed upon any sudden combat, without undue advantage being taken, and without any dangerous weapon being used, and not done in a cruel or unusual manner.

Because the burden is not on the Defendant, Brittany Carter, to prove the existence of these conditions, you must find Brittany Carter "not guilty" if the evidence raises a reasonable doubt in that the injury may have been caused by an accident resulting from the altercation that took place between Brittany Carter and her assailant.

While this Court recognizes that Carter was entitled to jury instructions that would present her theory of defense, there also must have been an evidentiary foundation to warrant giving the proposed accident instruction.

¶9.    Carter admitted in both her interview and at trial that she hit Mayfield with her car. She testified that she backed up and "revved up trying to get [Mayfield] to the fence . . . at the house that was straight ahead."  In an exchange between Carter and her attorney, Carter testified that she did not feel like there was any other way out of the situation with Mayfield.

> Q.    So you talk about backing up.  Why were you backing up?
>
> A.    To get away from [Mayfield].
>
> Q.    Was that working?
>
> A.    No, because she was still coming to my car.
>
> Q.    So, what did you do next?
>
> A.    Hit [Mayfield].
>
> Q.    I mean did you feel like there was any other way to get out of that situation?
>
> A.    No.

According to Carter's testimony, Mayfield was not that far from her car when she was

allegedly trying to hit Carter's car with rocks or bricks. Carter testified that Mayfield was within arm's length of Carter's car when Carter was in the process of backing up. Yet Carter testified that she backed up her car, revved her engine, and hit Mayfield while traveling between twenty and forty miles per hour.

¶10. Portions of Carter's initial testimony were corroborated by eyewitness Jacorey Ross. Ross testified that he heard a car engine "revving up." According to Ross, once Mayfield was struck by the car, her body flew up in the air and back on the car. Ross witnessed Mayfield's head under the fence and Carter's vehicle "drive up the fence and out of the driveway." Not only did Ross testify that he witnessed Carter hit Mayfield with her truck, he testified that he was forced to run behind a tree to escape being hit as well. Notably, Ross testified that he saw Mayfield walking down the sidewalk immediately before she was hit, and Mayfield did not have any bricks or rocks in her hand. According to Ross, Mayfield did nothing to provoke Carter that morning. La'Tisha Michael also testified that Mayfield regularly walked the neighborhood in the mornings; therefore, it was not unusual for her to be walking in that area the morning of March 30, 2017. Finally, while Carter testified that Mayfield had busted out her car window the previous day, no evidence was presented at trial to substantiate her claim. None of the photographs produced at trial showed the allegedly damaged window. Officer Mamie Barrett testified that none of the windows in Carter's vehicle were damaged when the photos were taken after Carter was arrested.

¶11. During trial, Carter's testimony evolved somewhat from the statements she made to law enforcement in her initial interview. More specifically, she later stated that she did not

intentionally hit Mayfield with her car. This statement alone, however, is the singular bit of evidence that could possibly substantiate the theory that Carter hit Mayfield by accident.

¶12. Similarly, in determining the propriety of giving a jury instruction on self-defense, the Mississippi Supreme Court stated that

> [s]elf[-]defense is a legal concept which **must be supported by evidence** to be available to a defendant in a homicide case. **The mere statement by a defendant that he killed his victim in "self-defense" is wholly incapable by itself of raising a factual question requiring its submission to the jury. The plea of self-defense must be supported by evidence of facts and circumstances** from which the jury may conclude that a defendant was justified in having committed the homicide because he was, or had reasonable grounds to believe that he was, in imminent danger of suffering death or great bodily harm at the hands of the person killed. . . . Nothing in the record supports Willis's theory that he was in imminent danger of suffering some great personal injury or death at the hands of Tamaneka Alexander. The trial judge recognized this and denied the instruction. Therefore, this Court finds that the trial court did not abuse its discretion by denying the jury instruction.

*Willis v. State*, 352 So. 3d 602, 616 (¶40) (Miss. 2022) (emphasis added).

¶13. In *Lester v. State*, 862 So. 2d 582, 586 (¶12) (Miss. Ct. App. 2004), this Court held that

> [t]he defense is entitled to an instruction covering its theory of the case so long as there is evidence in the record that would support that theory without regard to the probative value of that evidence so long as it is **more than a mere scintilla of proof**. *E.g. McGee v. State*, 820 So. 2d 700[, 705] (¶9) (Miss. Ct. App. 2000). However, in this case, **the only evidence dealing with Lester's use of force against Marple came from Lester's own testimony**.

(Emphasis added). In *Lester*, this Court held that the trial court did not err in refusing the requested instruction based on Lester's testimony at trial alone.

¶14. Going one step further, in *Weaver v. State*, 265 So. 3d 182 (Miss. Ct. App. 2018), this Court upheld the trial court's decision to refuse a jury instruction on imperfect self-defense

9

where a defendant's own testimony debunked any notion of intent in the moment the victim was shot. *Id*. at 190-95 (¶¶28-32) & n.4. This Court explained:

> In support of Weaver's theory of imperfect self-defense, the only version of the shooting that was before the jury was the version that Weaver testified to in court, wherein he stated that the shooting was purely an accident, not the various pretrial versions that he gave to law enforcement officers during their investigation of the crime.

*Id*. While Carter's versions of the March 30, 2017 incident changed slightly throughout the trial, like in *Weaver*, portions of her own testimony at trial debunk her theory of accident.

¶15. Finally, this Court has held:

> As with culpable negligence, "**[a]n intentional act cannot fit the doctrine of accident or misfortune**." *Montana v. State*, 822 So. 2d 954, 962 (¶33) (Miss. 2002). In cases that have found a sufficient evidentiary basis for an instruction on accident and misfortune in the heat of passion, there was at least some testimony that the killing was an accident. *See Clayton v. State*, 106 So. 3d 802 (Miss. 2012); *Evans v. State*, 797 So. 2d 811 (Miss. 2000); *Day v. State*, 589 So. 2d 637 (Miss. 1991). As stated above, there is nothing to indicate that the gun misfired or was shot by accident.

*Smith v. State*, 171 So. 3d 542, 547 (¶12) (Miss. Ct. App. 2015) (emphasis added). In *Harris v. State*, 642 So. 2d 1325, 1327 (Miss. 1994), the supreme court stated that "[i]ntent, being a state of mind, is rarely susceptible of direct proof, but ordinarily must be inferred from the acts and conduct of the party and the facts and circumstances attending them." In *Jones v. State*, 369 So. 3d 1006, 1012 (¶19) (Miss. Ct. App. 2023), this Court explained that Jones never stated that he accidentally fired the gun. "Rather, Jones claimed at trial that he 'did two shots' at Hudson '[b]ecause [his] life was in danger.'" Therefore the trial judge did not err by refusing the proposed accident instruction.

¶16. Similarly, Carter never denied that she put her car in reverse and then drove it towards

10

Mayfield. Further, Carter requested and received several self-defense instructions and an imperfect self-defense instruction on manslaughter. Based on Carter's own testimony regarding her actions and conduct and the testimony from eyewitnesses, we find no error by the court's refusing jury instruction D-18.

**II. Was the evidence presented at trial insufficient to overcome the alleged presumption that Carter acted in reasonable self-defense?**

¶17. In her second assignment of error, Carter argues that the State did not prove beyond a reasonable doubt that she did not act in self-defense when she struck and ultimately killed Mayfield with her vehicle. She contends that the proof was legally insufficient to overcome the "presumption that she reasonably feared imminent death or great bodily harm" when she drove her vehicle into Mayfield. This argument is obviously a reference to the "presumption" provided by the castle doctrine. In the face of a similar argument, this Court stated in *Beal v. State*, 225 So. 3d 1276, 1281 (¶10) (Miss. Ct. App. 2016):

> Despite Beal's argument on appeal regarding the castle doctrine's presumption of fear, we note that Beal did not request nor was he given a castle-doctrine jury instruction at trial. Rather, he proceeded under a theory of self-defense, for which no presumption of fear is given. Beal's failure to request a castle-doctrine jury instruction precludes review of this issue on appeal. *See King v. State*, 857 So. 2d 702, 717 (¶24) (Miss. 2003) ("A trial court has no duty to give unrequested instructions. Therefore, this contention is procedurally barred.").

Just as in *Beal*, Carter did not request or receive a jury instruction concerning the castle-doctrine's presumption of fear. Accordingly, this issue concerning the presumption of fear is procedurally barred on appeal.

¶18. We will address this assignment of error to the extent it challenges the legal

11

sufficiency of the evidence to show that Carter did not act in necessary self-defense.  In *Tubwell v. State*, 359 So. 3d 249, 250-51 (¶5) (Miss. Ct. App. 2023), this Court stated:

> We apply de novo review to a challenge to the sufficiency of the evidence. *Sims v. State*, 329 So. 3d 528, 534 (¶20) (Miss. Ct. App. 2021).  Relevant to Tubwell's appeal, our caselaw holds that
>
>> [w]hen reviewing a challenge to the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  The issue on appeal is not whether the reviewing court would have found the defendant guilty; rather, the conviction must be affirmed if there was sufficient evidence for any rational trier of fact to have rendered a guilty verdict.
>
> *Bradford v. State*, 337 So. 3d 277, 281 (¶13) (Miss. Ct. App. 2022) (citation and internal quotation marks omitted).

¶19.    While Carter testified that Mayfield suddenly attacked her car as she was driving down the street by banging on her car, throwing bricks and rocks at her car and screaming at her, another eyewitness told a different story.  As noted above, Ross testified that Mayfield did nothing to provoke Carter.  Ross said before Mayfield was struck by Carter's vehicle, Mayfield was walking past his bus stop, and he turned around when he heard Carter's engine.  According to Ross, Mayfield did not have anything in her hands and was not throwing anything at Carter's vehicle.

¶20.    In *Nelson v. State*, 850 So. 2d 201, 205 (¶12) (Miss. Ct. App. 2003), this Court addressed the duty to resolve conflicting evidence:

> The jury, after being properly instructed on the law, acts as the finder of fact having the duty to resolve conflicting evidence to determine what the jury finds to be more believable. "It is well settled that in such a case of conflicting testimony, each distinct view is absorbed into the minds of the jury as the

12

finders of fact, and it is within the province of the jury to determine the credibility among several witnesses." *Jackson v. State*, 614 So. 2d 965, 972 (Miss. 1993). Once the duty to resolve conflicts in the proof is accomplished, the jury's determinations are entitled to deference when challenged at the trial level or on appeal. *Windham v. State*, 800 So. 2d 1257, 1263 (¶18) (Miss. Ct. App. 2001).

In the present case, the jury was properly instructed on the issue of self-defense, and having obviously found the State's proof on this issue more credible, the jury found beyond a reasonable doubt that Carter did not act in necessary self-defense. Viewing the evidence in the light most favorable to the prosecution, we find there was legally sufficient evidence on this element.

## CONCLUSION

¶21. After reviewing the record, we find no error by the trial court. Therefore, Carter's conviction and sentence for second-degree murder are affirmed.

¶22. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR.**